SWAN CREEK COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Respondent,

Welch Communications, Inc., Intervenor.

No. 93–1230.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 30, 1994.

Decided Nov. 22, 1994.

Christopher D. Imlay, Washington, DC, argued the cause and filed the briefs for appellant.

David Silberman, counsel, F.C.C., Washington, DC, argued the cause for appellee. With him on the briefs were William E. Kennard, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, DC.

J. Richard Carr, Washington, DC, entered an appearance for intervenor.

Before: EDWARDS, Chief Judge, SENTELLE and ROGERS, Circuit Judges.

Opinion of the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Petitioner Swan Creek Communications, Inc. ("Swan Creek"), challenges the opinion and order of the Federal Communications Commission finding that Swan Creek was financially unqualified for the construction permit for an FM station in Swanton, Ohio, and that its partners lacked candor before the Commission. Petitioner also challenges the Commission's finding that intervenor Welch Communications, Inc. ("Welch"), was financially qualified. Because there is substantial evidence to support the Commission's finding of lack of candor, we do not reach the issue of Swan Creek's financial qualifications. Further, as a result of its lack of candor, Swan Creek is ineligible to compete for the Swanton station and therefore we need not address its challenge of the grant of the permit to Welch. Accordingly, we deny the petition in part and dismiss the petition in part.

## I.

Swan Creek is an Ohio limited partnership owned 51% by Jerry Toth and 49% by Thomas Gardull. *Initial Decision, Welch Communications, Inc.,* 5 F.C.C.R. 2927, 2929 (1990) (*"Initial Decision"*). On August 27, 1987, Swan Creek and three other candidates submitted applications to the Federal Communications Commission to construct and operate an FM radio station in Swanton, Ohio. Two of the applicants eventually withdrew from the competition, leaving Swan Creek and Welch.[1]

In its application, Swan Creek proposed to operate the Swanton station as a full-service radio station. The partners estimated construction costs of $108,000 and start-up operating expenses of approximately $11,000 per month. Swan Creek therefore calculated that it would need $141,000 to construct the radio station and operate it for three months.[2] *Supplemental Initial Decision, Welch Communications, Inc.,* 7 F.C.C.R. 568, 571 (1992) (*"Supplemental Decision"*). Toth and Gardull planned to fund the operations with a $125,000 loan from Toth's father and with $102,000 from their personal resources. *Id.* Comparative hearings on Swan Creek's and Welch's proposals were held on March 27, 1989, and September 20, 1989, before an FCC administrative law judge ("ALJ"), who awarded the station permit to Swan Creek on comparative terms. *Initial Decision,* 5 F.C.C.R. 2927.

Upon appeal by Welch, the FCC Review Board reversed the ALJ and remanded for a determination of whether Swan Creek was financially qualified and whether it showed a lack of candor in its submissions to the FCC. *Memorandum Opinion and Order, Welch Communications, Inc.,* 5 F.C.C.R. 4850 (Rev. Bd.1990) (*"Review Board I"*). The Review Board noted that on April 4, 1988, Swan Creek had filed another application for a new FM radio station in Lima, Ohio. *Id.* As in its Swanton application, Swan Creek certified that it had "reasonable assurance" of sufficient net liquid assets to construct the Lima station and operate it for three months without revenues. *Id.* Although acknowledging that Swan Creek ultimately dismissed the Lima application on May 8, 1989, the Review Board questioned the accuracy of Swan Creek's financial certifications during the thirteen months when both applications were pending. *Id.* at 4851. The Review Board noted that Swan Creek partner Jerry Toth had testified that "Lima was applied for as a second possibility, should Swanton not be successful," and that Swan Creek was relying on the same source of funding to finance both the Swanton and Lima stations. *Id.* at 4850–51. When asked what would happen if Swan Creek was granted construction permits for both stations, Toth answered that the partners had talked about this possibility but had yet to decide how they would respond. *Id.* at 4850. Significantly, Toth had testified that "there is no way" the partners could finance both the Swanton and Lima stations. *Id.* In light of this testimony, the Review Board found that there were "substantial questions of fact as to Swan [Creek]'s financial certifications, and whether Swan [Creek] has deceived the Commission in its certification of two applications when it appears to know it could only afford to finance (at best) only one." *Id.* at 4851.[3]

Upon remand, Swan Creek took the position that it had always intended Lima to be a "bare bones" station and that it could therefore afford to construct and operate both the Lima and Swanton stations for the requisite three-month start-up period. *Supplemental*

---

**1.** Although Welch's motion to intervene was granted, Welch did not submit a brief to the court.

**2.** The FCC application form completed by both Welch and Swan Creek provides:

An applicant for a new station must certify that i[t] has sufficient net liquid assets on hand or committed sources of funds to construct the proposed facility and operate for three months, without revenue.

*Memorandum Opinion and Order, Welch Communications, Inc.,* 5 F.C.C.R. 4850, 4850 (Rev.Bd. 1990).

**3.** The Review Board rejected Swan Creek's argument that its inability to finance both facilities resulted from significant costs incurred in prosecuting the Swanton application. "Rather, the record thus far suggests that Swan [Creek]'s General Partners were aware from the outset that they did not possess the requisite funds to construct and operate both facilities as proposed." *Id.*

*Decision,* 7 F.C.C.R. at 571; *Review Board II,* 7 F.C.C.R. at 4546. According to the ALJ, Gardull asserted that Swan Creek was financially qualified to implement both proposals if it employed "very cheap ways" of putting the Lima station on the air "for next to no money." *Supplemental Decision,* 7 F.C.C.R. at 571. In their direct written testimony on remand, the Swan Creek partners asserted:

> Our review of the [Lima] market indicated that there was a need for an easy listening format which could be automated. This was in accordance with our assumption that Lima would have to be a limited budget facility, given our commitment to Swanton. To meet our ability to construct and operate, Lima was not to be a "showcase" facility at startup.

The partners claimed that they "made calculations" for the Lima facility "based on a fully-automated station, with no announcers or office staff." They attested that they would complete all office work and pre-recording at the Swanton station. The Lima station would have no employees; to generate advertising revenues, sales persons would work for commission "out of their cars, or from desks at the transmitter building, where a phone line would be located." Based on these assumptions, the partners testified, "Our conclusion was that we could construct and operate a limited facility in addition to Swanton."

The ALJ rejected Swan Creek's attempts to reconcile the Lima and Swanton proposals and concluded that Swan Creek could not afford to construct and operate both stations. *Id.* at 574–75. The ALJ found Swan Creek's claim that it could construct and operate the Lima facility for $22,000 "of doubtful validity," observing that Swan Creek's proposal to operate a station with no full-time employees and total dependence on another station's technical facilities and staff was "so out of touch with reality as to be classified as 'inherently incredible.'" [4] *Id.* at 574 (quoting

*Pepper Schultz,* 4 F.C.C.R. 6393 (Rev.Bd. 1989)). Noting that "the Review Board has refused to fully credit the Lima dismissal," the ALJ concluded that "Swan Creek is not now financially qualified to be a Commission licensee." *Id.* at 575.

The ALJ resolved the financial misrepresentation issue, however, in Swan Creek's favor. While concluding that it was a mistake for Swan Creek to file both applications at the same time, the ALJ observed that the error "doesn't automatically brand them as liars." *Id.* In his view:

> Jerry Toth frankly admitted that he and Gardull had applied for Lima as a second possibility should Swanton not be successful; that they were simply trying to cover themselves; and that they preferred Swanton over Lima. That testimony will be credited.... [T]he trial judge observed Jerry Toth's and Thomas Gardull's demeanor. He found both men creditable.

*Id.* The ALJ, based solely on the partners' testimony at the initial hearing before remand, determined that the partners had not deliberately misrepresented their financial qualifications in their certifications to the Commission. *Id.*

The ALJ found against Welch on both financial and misrepresentation grounds and concluded, therefore, that neither applicant was qualified for the Swanton station. *Id.*

The Review Board affirmed the ALJ's disqualification of Welch on financial and misrepresentation grounds and agreed that Swan Creek was not financially qualified. *Decision, Welch Communications, Inc.,* 7 F.C.C.R. 4542, 4545, 4547 (Rev.Bd.1992) (*"Review Board II "*). On the question of lack of candor, however, the Board reversed the ALJ's ruling in favor of Swan Creek. *Id.* at 4547. Noting "the spontaneous, candid testimony of Toth and Gardull at the initial hearing that Swan [Creek] simply could not afford to prosecute, construct, and operate both proposed facilities," [5] the Board pointed

---

4. The ALJ also questioned the liquidity of the partners' assets, ultimately crediting only $48,926 of the $102,000 in assets claimed by Toth and Gardull. *Id.* at 574. Even if Swan Creek could construct and operate the Lima station for $22,000, the ALJ concluded, it did not have sufficient assets to support both operations.

5. Toth's partner, Thomas Gardull, had agreed in his initial testimony that the partners did not have sufficient resources to complete both projects, although he added that "there are certainly very cheap ways of putting a radio station on the air...." *Id.* at 4546.

out that on remand—after learning that the Lima application would be considered in assessing their financial qualifications—the partners changed their story. *Id.* The Board rejected as improbable the partners' insistence that they had always envisioned Lima as a "bare bones" operation and that they had, prior to filing, carefully calculated the costs of both Lima and Swanton and determined that they could afford both stations. "[T]hese claims," the Board found, "are clearly at odds with the representations made to the Commission in Swan [Creek]'s Lima application." *Id.* The Board noted that Swan Creek's application described Lima as a full-service station with several full-time employees:

> (1) Swan [Creek] represented it would employ *five or more* full-time employees at Lima ...; and (2) Swan [Creek] promised the Commission it would broadcast "extensive ... locally produced Public Service Announcements;" "News will include school news ... closings ... traffic and road conditions ... market reports, sports, agriculture, and local issues;" and, "comprehensive Weather Reports will be given every hour...."

*Id.* at 4547. In light of the marked contrast between Swan Creek's application and initial testimony, on the one hand, and its later recharacterization of the Lima station, on the other, the Board concluded that the Swan Creek partners lacked candor in their testimony after remand: "[G]iven the testimony of Toth and Gardull at the initial hearing and their completely different testimony at the remand hearing, the Board concludes that, at a minimum, these individuals have lacked candor with the ALJ and the Commission." [6] *Id.*

Upon appeal by Swan Creek, the Commission affirmed the Board's findings against Swan Creek while reversing the ALJ and the Review Board rulings against Welch. *Welch Communications, Inc.,* 8 F.C.C.R. 1285 (1993). Swan Creek now petitions for review of the Commission's opinion and order.

## II.

In assessing the Commission's decision, the court applies a deferential standard of review, affirming the agency's conclusions if they "are supported by the record and ... are not arbitrary or capricious." *WHW Enterprises, Inc. v. F.C.C.,* 753 F.2d 1132, 1139 (D.C.Cir.1985); *Weyburn Broadcasting Ltd. Partnership v. F.C.C.,* 984 F.2d 1220, 1228 (D.C.Cir.1993). Although the Review Board and the Commission reversed the ALJ on the lack of candor issue, the Commission is not bound by the ALJ's findings so long as its own findings are supported by substantial evidence. *See WHW Enterprises,* 753 F.2d at 1141.

Because the Commission affirmed the Review Board's lack of candor ruling against Swan Creek without comment, the court must look to the Review Board decision in assessing the Commission's determination. The Review Board concluded, based on "the testimony of Toth and Gardull at the initial hearing and their completely different testimony at the remand hearing," that, "at a minimum, these individuals have lacked candor with the Commission." *Review Board II,* 7 F.C.C.R. at 4547. The lack of candor decision did not rest simply on Swan Creek's partners' financial certifications to the Commission. [7]

The FCC generally views "misrepresentation and lack of candor in an appli-

---

**6.** Thus, although the Board had remanded for a determination of whether Swan Creek made deliberate misrepresentations in its certifications, the Board resolved the lack of candor issue against Swan Creek based on the partners' attempt on remand to reconcile the two applications by retracting both the information in their Lima application and their earlier sworn testimony before the ALJ. *Id.* The Board, therefore, based its lack of candor finding on grounds neither decided nor considered by the ALJ.

**7.** The Board noted, however, that "the truthfulness and accuracy of the certifications of ...

financial qualifications are of paramount importance." *Id.* Although the Board did not expressly find that the Swan Creek principals showed a lack of candor in the financial certifications that they submitted to the Commission, it observed that "Swan [Creek] did not have sufficient funds to construct and operate both proposed facilities, and ... [that] the two principals of Swan [Creek] *knew* that they did not possess the requisite financial qualifications to construct both the Swanton and Lima stations (which applications were simultaneously pending before the Commission for more than one year)." *Id.* (emphasis in original).

cant's dealings with the Commission as serious breaches of trust." *Policy Regarding Character Qualifications in Broadcast Licensing,* 102 F.C.C.2d 1179, 1211 (1986). The Commission defines misrepresentation as "an intentional misrepresentation of fact intended to deceive." *Silver Star Communications–Albany, Inc.,* 3 F.C.C.R. 6342, 6349 (Rev.Bd.1988). Lack of candor, on the other hand, exists when an applicant breaches its duty "to be fully forthcoming as to all facts and information relevant to a matter before the FCC, whether or not such information is particularly elicited." *Id.; see also Fox River Broadcasting, Inc.,* 93 F.C.C.2d 127, 129 (1983).

 Direct misrepresentations or omissions to the Commission can result, by themselves, in disqualification. As the Review Board stated in *Old Time Religion Hour, Inc.,* 95 F.C.C.2d 713, 719 (Rev.Bd.1983):

> [A]n applicant may be disqualified on the basis of its principals' candorless testimony when the lack of candor occurs "before the judge's own eyes." Moreover, the Commission has long held that false statements in the course of the hearing process are, in and of themselves, of substantial significance, that specific notice to an applicant that he must testify truthfully is superfluous, and that such false testimony may lead to disqualification.

*Id.* (citations omitted); *see also KQED, Inc.,* 3 F.C.C.R. 2601, 2606 (Rev.Bd.1988). The Commission will not disqualify an applicant, however, for a negligent omission; "intent to deceive [is] an essential element of a misrepresentation or lack of candor showing." *Weyburn Broadcasting,* 984 F.2d at 1232; *see also Garden State Broadcasting Ltd. Partnership v. F.C.C.,* 996 F.2d 386, 393 (D.C.Cir.1993); *RKO General, Inc. v. F.C.C.,* 670 F.2d 215, 225 (D.C.Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982).

The Review Board concluded that Swan Creek lacked candor because of inconsistencies in Toth's and Gardull's submissions and testimony before the Commission. In particular, the Review Board found the partners' claim upon remand that they had always intended Lima to be a low-cost, no-frills station "clearly at odds with the representations

made to the Commission in Swan [Creek]'s Lima application." *Review Board II,* 7 F.C.C.R. at 4547. The Review Board also concluded that Swan Creek could not square its position upon remand with the "spontaneous, candid testimony of Toth and Gardull at the initial hearing that Swan [Creek] simply could not afford to prosecute, construct, and operate both proposed facilities. . . ." *Id.*

 The Board's lack of candor determination is supported by substantial evidence in the record. Swan Creek's Lima application described a full-service radio station with several full-time employees. Toth and Gardull admitted in the initial hearing that they could not afford to construct and operate both Swanton and the proposed Lima facility. The record makes clear that Swan Creek's later recharacterization of the Lima proposal as a bare-boned, pre-programmed station was a belated attempt to harmonize the two inconsistent applications. The partners' assertion on remand that Swan Creek had always planned and intended to construct and operate both the Swanton and Lima stations is contradicted by the Lima application, the partners' initial testimony, and the ALJ's findings of fact. *Supplemental Decision,* 7 F.C.C.R. at 575.

The ALJ's demeanor determinations are not to the contrary. Although Swan Creek correctly notes that the ALJ found its partners "creditable" and decided the candor issue in their favor, the ALJ considered only their behavior prior to and during the initial hearing. He concluded that the partners had made an honest mistake in filing the Lima application and that they "frankly admitted" that they had filed Lima as a back-up to the Swanton proposal. His conclusions, therefore, were directed solely at whether the partners had an intent to deceive when they filed their Lima application. He did not decide the question upon which the Review Board based its disqualification decision: whether the partners' later attempts to retract their "frank[ ] admi[ssions]" showed a lack of candor. *Review Board II,* 7 F.C.C.R. at 4547.

 Consequently, although the usual lack of candor finding is made after a hearing on the issue before the ALJ, *RKO General,* 670 F.2d at 231, where, as here, an irremedi-

able conflict appears between records submitted to the Commission and testimony in the instant proceeding, the Board could properly make a lack of candor determination without an evidentiary hearing. *See id.; Old Time Religion Hour,* 95 F.C.C.2d at 719. Therefore, the Commission was justified in affirming the finding of a lack of candor based on " 'facts already known,' " when an evidentiary hearing "would have served no purpose." *See RKO General,* 670 F.2d at 231 (quoting *Lakewood Broadcasting Service, Inc. v. F.C.C.,* 478 F.2d 919, 924 (D.C.Cir.1973)).[8] Given the evidence, the Commission acted reasonably in affirming the Review Board's finding that Swan Creek, after remand, acted less than honestly in describing its intentions for the Lima facility. The Commission therefore did not err in disqualifying Swan Creek on the ground that,

"at a minimum, [its partners] have lacked candor with the ALJ and Commission." *Review Board II,* 7 F.C.C.R. at 4547. *See RKO General,* 670 F.2d at 234; *Wadeco, Inc. v. F.C.C.,* 628 F.2d 122, 129 (D.C.Cir.1980).

■ Accordingly, because Swan Creek is barred from competing for the Swanton station as a result of its lack of candor, *Garden State,* 996 F.2d at 395, the court has no occasion to address Swan Creek's challenges to the Commission's finding that it was financially unqualified. Furthermore, because Swan Creek would remain disqualified even if the court were to conclude that the Commission erred in approving Welch's application, the court need not address Swan Creek's challenge to the Commission's award of the construction permit to Welch.[9] *Id.;* 47 U.S.C. § 402(b)(6).[10] Therefore, we deny the ·

8. On these facts, it seems clear beyond dispute that the actions of the Swan Creek partners do not warrant any further sanction beyond disqualification from the Swanton proceeding. The Swan Creek partners, Jerry Toth and Thomas Gardull, originally attempted to prosecute their license applications without the aid of counsel. They had never previously applied for an FCC license, and their ineptness was revealed. But the ALJ, who heard their statements, concluded that Swan Creek made an honest mistake by filing for both the Swanton and Lima stations at the same time. *Supplemental Initial Decision, Welch Communications, Inc.,* 7 F.C.C.R. 568, 575 (1992). Although Toth and Gardull attempted to rectify this mistake by exaggerating their intentions regarding the Lima station to the Commission, there is nothing in the record to suggest that these men were deceitful applicants engaged in some fraudulent enterprise designed to misuse the licensing process. They made mistakes, for which they have been penalized—that should be the end of it. In short, there appears to be no reason why Swan Creek's disqualification from the Swanton license should prevent Toth and Gardull from applying for or acquiring an FCC license in the future. *See Policy Regarding Character Qualifications In Broadcast Licensing,* 102 F.C.C.2d at 1210–11, 1224–25 (FCC has generally reserved "the ultimate sanction of removal of all licensee rights ... for cases of egregious misconduct evincing a pervasive unwillingness or inability to meet the basic responsibilities of a licensee"); *KQED, Inc.,* 3 F.C.C.R. at 2609 (license renewal for different station); *see also Faulkner Radio, Inc.,* 88 F.C.C.2d 613, 616–618 (1981) (limiting non-renewal to single station because of "isolated context" of misconduct); *KPFW Broadcasting Company,* 47 F.C.C.2d 1090, 1095–96 (1974) (granting renewal and new construction permit in light of "unlikelihood that the misconduct involving [a different station] will be

repeated"); *Policy Regarding Character Qualifications,* 102 F.C.C.2d at 1228 ("[s]uffering the loss of one station, with the costs thereby imposed, will likely serve to deter all but the most unrepentant from serious future misconduct"); *e.g., WIOO, Inc.,* 95 F.C.C.2d 974, 984 (1983); *cf. RKO General,* 670 F.2d at 236–37.

9. In challenging the Commission's approval of Welch's application, Swan Creek argues primarily that Welch's principal source of funding, Broadcast Capital Fund (BROADCAP), did not provide sufficient "reasonable assurances" of financing to satisfy *Scioto Broadcasters Limited Partnership,* 5 F.C.C.R. 5158, 5160 (Rev.Bd. 1990). In light of our conclusion that Swan Creek's lack of candor is fatal to its cause, we reserve for another day the question of whether, as the Commission found, BROADCAP provided "reasonable assurances" under *Scioto. Welch Communications, Inc.,* 8 F.C.C.R. 1285. Our failure to address Swan Creek's challenge in this regard should not, however, be viewed as an implicit endorsement of the Commission's action in this proceeding. The Commission's decision to find Welch financially qualified appears almost impossible to square with FCC policy under *Scioto,* particularly in the absence of a coherent explanation. Of course, if the Commission simply changed the rules in the instant case, ignoring the requirements of *Scioto,* in order to favor Welch with the award, the Commission's decision could not withstand scrutiny.

10. Only parties who are "aggrieved or whose interests are adversely affected by an order of the Commission granting or denying" a licensing application may appeal that order to this court. 47 U.S.C. § 402(b)(6); *see also Garden State,* 996 F.2d at 395.

petition in part and dismiss the petition in part.