**CONTEMPORARY MEDIA, INC., et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**No. 99–1198.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 18, 2000.

Decided June 16, 2000.

Howard J. Braun argued the cause for appellants. With him on the briefs were Jerold L. Jacobs and Shelley Sadowsky.

Lisa A. Burns, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel.

Before: SILBERMAN, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Three radio licensees appeal the Federal Communications Commission's (FCC's) revocation of their licenses and construction permits, as well as its denial of their application for a new station. The FCC took those actions after the licensees' sole owner and president was convicted of sexually abusing children, and after the licensees made misrepresentations to the Commission about the owner's continued involvement in station affairs. In the end, the case is no more difficult than this recitation of the facts suggests, and we therefore affirm the FCC in all respects.

## I

The appellant licensees own and operate five radio stations in Missouri and Indiana, hold two construction permits for radio stations in Missouri, and have an application pending for another Missouri station. Michael Rice is the sole shareholder, president, and treasurer of all three licensees and serves on each licensee's board of directors. In November 1990, Rice was arrested for criminal conduct involving sexual acts with a teenager. In April of the following year, he was formally charged with three felony counts of sexual assault on an individual between fourteen and sixteen years of age. The prosecutor subsequently amended the charges to include eight felony counts of sexual assault on individuals between fourteen and sixteen years of age, and four felony counts of forcible sodomy of individuals under fourteen years of age. The sexual abuse involved five children and occurred between December 1985 and October 1990. Two days after the charges were filed, Rice checked himself into a St. Louis hospital for in-patient psychiatric treatment.

In June 1991, two of the licensees filed reports notifying the FCC of the charges against Rice. The reports were filed pursuant to 47 C.F.R. § 165(a), which requires FCC license applicants to maintain "the continuing accuracy and completeness of information furnished" in pending applications. Each report stated that:

> Since Mr. Rice's hospitalization on April 3, 1991, he has had absolutely no managerial, policy, or consultative role in the affairs of the three broadcast corporations in which he has ownership inter-

ests and officer positions. In other words, pending a resolution of the referenced criminal charges, Mr. Rice is being completely insulated and excluded from any involvement in the managerial, policy, and day-to-day decisions involving any of the four licensed stations and three construction permits held by the three corporations.

J.A. at 15–16, 120 (citation omitted). In October 1991, Rice was discharged from the hospital. On May 14, 1992, one of the licensees filed another report with the FCC, stating:

> There has been no change in Mr. Rice's status with [the reporting licensee] or in the status of the proceedings against him . . . . Mr. Rice is no longer hospitalized, but he continues to be treated by his physicians as an outpatient, and he continues to have no managerial or policy role in the affairs of the three broadcast corporations . . . in which he has ownership interests and corporate positions.

*Id.* at 126–27 (citation omitted).

On August 31, 1994, Rice was convicted of all twelve felony counts against him: four counts of forcible sodomy, six counts of deviate sexual assault in the first degree, and two counts of deviate sexual assault in the second degree. The court sentenced him to a total of eighty-four years in prison. Because the sentences were set to run concurrently, his maximum term of confinement amounted to eight years. Rice began his incarceration on September 30, 1994, and is currently eligible for release.

On October 10, 1995, the FCC ordered an evidentiary hearing at which the licensees were directed to show cause why their licenses and construction permits

should not be revoked and their pending application denied. The central issues at the hearing were: (1) the effect of Rice's felony convictions on the basic character qualifications of the licensees, and (2) whether the licensees had misrepresented to the FCC that, subsequent to his arrest, Rice had been excluded from the management and operation of the stations. After the hearing, the Administrative Law Judge (ALJ) concluded that revocation of the licensees' authorizations was appropriate due to the egregious nature of Rice's misconduct and to the misrepresentations made by the licensees in their reports to the Commission. The FCC affirmed.

## II

■ The licensees' appeal raises a number of challenges, which we address in turn. First, they challenge the legality of the character policy upon which the FCC's decision was based. We must sustain that policy unless we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A); *see ACLU v. FCC*, 823 F.2d 1554, 1574 (D.C.Cir.1987).[1]

Section 308(b) of the Federal Communications Act provides that "[a]ll applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, . . . and other qualifications of the applicant to operate the station." 47 U.S.C. § 308(b). For many years, the FCC had no express policy concerning the character qualifications of its applicants; the Commission considered a wide range of factors in evaluating character, and as a consequence its evaluations sometimes yielded inconsistent results. *See Policy Regarding Character*

---

1. The licensees rely on our decision in *Bechtel v. FCC*, 10 F.3d 875 (D.C.Cir.1993), which stated that agencies must be prepared to defend the underlying validity of policy statements because those statements "are exempt from the Administrative Procedure Act's notice-and-comment requirements and hence

may take effect without the rigors—and presumed advantages—of that process." *Id.* at 878 (citation omitted). Because we conclude that the FCC did adequately justify its policies in the decision under review, *Bechtel* does not affect our analysis.

*Qualifications in Broadcast Licensing,* 87 F.C.C.2d 836, 836–37 (1981) (notice of inquiry). The Commission responded to this problem in 1986 with the adoption of a comprehensive character policy statement. *See Policy Regarding Character Qualifications in Broadcast Licensing,* 102 F.C.C.2d 1179 (1986) [hereinafter *1986 Character Policy Statement*]. The statement announced that the FCC's character analysis would focus on "misconduct which violates the Communications Act or a Commission rule or policy, and ... certain specified nonFCC-misconduct which demonstrate[s] the proclivity of an applicant to deal truthfully with the Commission and to comply with [its] rules and policies." *Id.* at 1190–91. The relevant nonFCC-misconduct was limited to adjudicated cases involving: fraudulent representations to government agencies, criminal false statements or dishonesty, and broadcast-related violations of antitrust laws or other laws concerning competition. *See id.* at 1195–1203. The FCC noted, however, that "there may be circumstances in which an applicant has engaged in nonbroadcast misconduct so egregious as to shock the conscience and evoke almost universal disapprobation." *Id.* at 1205 n. 60. "Such misconduct," the Commission stated, "might, of its own nature, constitute *prima facie* evidence that the applicant lacks the traits of reliability and/or truthfulness necessary to be a licensee, and might be a matter of Commission concern even prior to adjudication by another body." *Id.*[2] The 1986 statement also listed mitigating factors that the Commission would consider in evaluating specific acts of misconduct. *See id.* at 1227–28.

In 1990, the FCC determined that its 1986 policy had taken "an overly narrow view of the range of misconduct that should be relevant in licensing decisions." *Policy Regarding Character Qualifications in Broadcast Licensing,* 5 F.C.C.R.

3252, 3252 (1990) [hereinafter *1990 Character Policy Statement*]. It therefore amended that policy with a new statement, which explained:

> [U]pon further reflection, we believe a propensity to comply with the law generally is relevant to the Commission's public interest analysis, and that an applicant's or licensee's willingness to violate other laws, and, in particular, to commit felonies, also bears on our confidence that an applicant or licensee will conform to FCC rules and policies.... Thus, evidence of any conviction for misconduct constituting a felony will be relevant to our analysis of an applicant's or licensee's character.

*Id.* The FCC further stated that although "not all convictions for serious crimes are equally probative" of propensity to obey the law, it would not "establish a 'hierarchy' of felonies that may arise in individual cases." *Id.* Rather, the Commission would analyze misconduct on a case-by-case basis through the examination of mitigating factors. As in 1986, the Commission stated that for nonFCC-conduct it generally would consider only adjudicated cases. However, it "continue[d] to believe that, where an applicant has allegedly engaged in nonbroadcast misconduct 'so egregious as to shock the conscience and evoke almost universal disapprobation,' such conduct 'might be a matter of Commission concern even prior to adjudication by another body.'" *Id.* at 3252 n. 5 (quoting *1986 Character Policy Statement,* 102 F.C.C.2d at 1205 n. 60).

The licensees' challenge to the legitimacy of the current character policy is threefold. First, they contend that there is "no justification for license revocation based on nonFCC-related criminal misconduct of a licensee's principal, even if such misconduct was 'egregious.'" Br. of Appellants at 17. According to the licensees, such

---

**2.** In addition, the FCC explicitly reserved the option of expanding the range of relevant misconduct "[s]hould [its] future experience indicate that [it had] erred ... in narrowing the range of nonFCC misconduct to be considered for character purposes." *1986 Character Policy Statement,* 102 F.C.C.2d at 1208 n. 75.

revocation is particularly inappropriate in this case because "there was *no nexus* between Mr. Rice's sexual misconduct and the Licensees' broadcast activities." *Id.* at 16 (emphasis in original).

■ We disagree, both as a general matter and with regard to the specifics of this case. As to the former, it should be noted that the FCC's policy is not automatically to disqualify a license holder or applicant who commits a felony, but rather to consider the felony as a relevant factor in evaluating propensity to obey the law. *See 1990 Character Policy Statement,* 5 F.C.C.R. at 3252. We see nothing irrational in the conclusion that a violation of the criminal laws is relevant to that evaluation and to the issue of character in general. *See generally DiCola v. FDA,* 77 F.3d 504, 507–08 (D.C.Cir.1996). The FCC relies heavily on the honesty and probity of its licensees in a regulatory system that is largely self-policing. *See Leflore Broad. Co. v. FCC,* 636 F.2d 454, 461 (D.C.Cir.1980) ("[E]ffective regulation is premised upon the agency's ability to depend upon the representations made to it by its licensees...."). Under such a regime, a felony conviction—any felony conviction—is certainly a factor to be considered. It may not necessarily be a dispositive factor, and all such convictions may not be equally probative—as the FCC recognizes. *See 1990 Character Policy Statement,* 5 F.C.C.R. at 3252. But it is hard to see the argument that a felony conviction is not relevant at all.

■ In this case, moreover, the argument is particularly weak. It is hardly irrational to conclude that if an individual is unwilling to obey the law with respect to such patently criminal behavior as sexual assault on children, he will be equally unwilling to obey FCC rules that require openness and honesty with the Commission. Indeed, as discussed below, that connection was borne out in this case. Because the policy of considering felonious misconduct was clearly permissible as applied to the licensees, they cannot succeed in their attempt to challenge it on its face. *Cf. Romer v. Evans,* 517 U.S. 620, 643, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Steffan v. Perry,* 41 F.3d 677, 693 (D.C.Cir. 1994) (en banc).

■ Second, the licensees argue that the FCC's character policy is arbitrary and capricious because it does not provide any criteria for determining which nonFCC-related misconduct is sufficiently serious to affect a licensee's propensity for reliability in its dealings with the agency. Given the myriad forms of criminal misconduct, the FCC's decision is not unreasonable. The Commission cannot be required to foresee the variety of criminal behavior in which licensees or their owners may partake. And once again, whatever the issue with respect to crimes that might be regarded as being on the boundary of "egregiousness," the reasonableness of the FCC's decision in the instant case is clear. There is no question but that the crimes at issue here are, as the FCC found, "characterized by moral turpitude" to such an extent that they "fall[ ] in the category of those that 'shock the conscience' and summon almost universal disapproval," *Contemporary Media, Inc.,* 13 F.C.C.R. 14,-437, 14,444 (1998)—a category that the FCC expressly warned would be the subject of special agency concern. *See 1990 Character Policy Statement,* 5 F.C.C.R. at 3252. n. 5.

■ The licensees' third contention is that the FCC's character policy is inconsistent with the precedent of both this circuit and the Commission itself. The licensees cite *Wilkett v. ICC,* in which this court reversed a license revocation based on the sole proprietor's convictions for second-degree murder and conspiracy to distribute a controlled substance. *See* 710 F.2d 861 (D.C.Cir.1983). That case, however, is readily distinguishable. In *Wilkett,* the court's analysis focused on the fact that the Interstate Commerce Commission had "disregarded its own standards for evaluating [licensee] fitness." *Id.* at 864. The

court found that the Commission had failed to "carefully scrutinize[ ] the past violations and consider[ ] mitigating circumstances," as it had in "numerous cases" in the past. *Id.* Here, by contrast, the FCC not only gave careful consideration to Rice's crimes, but it did so pursuant to and in accordance with its published character policy. After scrutinizing the misconduct at issue, the FCC concluded that it was "extremely serious" and involved "numerous acts." *Contemporary Media,* 13 F.C.C.R. at 14,444. Then, as discussed below, the Commission closely evaluated the licensees' claims of mitigation and reasonably rejected them. Moreover, the convictions were not the sole ground for the revocation decision as they were in *Wilkett*; here the licensees were also found to have· violated the Commission's candor requirements in connection with the very matter now before us.

The licensees also cite *Kravis Co.,* 11 F.C.C.R. 4740 (1996), in which the FCC renewed radio licenses despite the fact that the company's president and sole shareholder had been charged with possession and exhibition of child pornography. As the Commission explained in its decision below, however, in that case neither a conviction nor a judgment of guilt had been entered against the defendant; instead, the court had placed him on probation pursuant to the state's deferred judgment procedure, which permitted the expungement of the charges after successful completion of a probation period. *See Contemporary Media,* 13 F.C.C.R. at 14,-442–43. As noted above, the FCC's character policy states that the Commission generally will consider only instances of adjudicated misconduct. *See 1990 Character Policy Statement,* 5 F.C.C.R. at 3252.

Regardless of whether it would be reasonable to erase that line, it is not unreasonable to draw it.[3]

### III

Having found no merit to the licensees' challenges to the FCC's character policy itself, we now consider their challenges to the application of that policy in this case. The licensees argue that even if the character policy is legitimate, the Commission erred both in failing to consider numerous mitigating factors that are relevant under the policy, and in concluding that the licensees misrepresented Rice's continued involvement in station affairs. We address each argument below. Once again, we are mindful that we must sustain the FCC's order unless the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and that we must uphold its findings of fact if they are supported by substantial evidence, *see id.* § 706(2)(E); *Damsky v. FCC,* 199 F.3d 527, 533 (D.C.Cir.2000).

### A

The FCC's character policy sets forth a number of mitigating factors to be considered in evaluating misconduct: "the willfulness of the misconduct, the frequency of the misconduct, the currentness of the misconduct, the seriousness of the misconduct, the nature of the participation (if any) of managers or owners, efforts made to remedy the wrong, overall record of compliance with FCC rules and policies, and rehabilitation." *1990 Character Policy Statement,* 5 F.C.C.R. at 3252. Although the FCC credited the licensees'

---

**3.** The licensees seek further support from *Alessandro Broadcasting Co.,* in which the FCC determined that no demerit was warranted for an applicant whose majority shareholder had been convicted of second-degree murder. *See* 99 F.C.C.2d 1 (1984). That decision, however, was rendered before the Commission's 1990 character policy statement gave import to felonies unrelated to dishonesty or broadcast-industry conduct. Moreover, in *Alessandro,* the agency noted that "the crime was an isolated event that occurred in the remote past and the state authorities connected with [the] conviction . . . [had] determined officially that [the shareholder was] rehabilitated and [had] restored his civil rights." *Id.* at 11 n. 13. None of those factors is present in this case.

record of regulatory compliance, it rejected all of the other potential bases for mitigation. We agree with the FCC's judgment; indeed, it is hard to regard most of the licensees' contrary arguments as anything but insubstantial.

■ First, the licensees note that although Rice could have been sentenced to eighty-four years in prison, he was instead sentenced to concurrent terms of "only" eight years. Br. of Appellants at 21. We do not understand the argument. We have no idea, and the licensees have offered none, as to why the state court showed such mercy. Indeed, we have no idea whether it did show mercy—that is, whether the court had sentencing discretion, or whether Rice's crimes were subject to state sentencing laws or guidelines that dictated the sentence he received. Furthermore, we do not regard a sentence of "only" eight years as indicating that Rice's felonies were somehow "less serious," or that the sentencing court found them so. And finally, we do not understand how the repeated sexual assault of five children could be regarded as anything less than egregious; perhaps wisely, licensees do not suggest what misconduct they would regard as more serious than that described in this record.

■ Second, the licensees argue that they were entitled to benefit from the "participation of management or owners" mitigation factor. Again, we do not understand the argument. Although it is true that no other "owner" participated in Rice's misconduct, it is only true because there is no other owner: Rice owns all of the equity in each of the licensees. Nor was Rice a minor player in management; he was the president of all of the licensees and sat on the board of directors of each. And while the other corporate managers did not participate in the sexual assaults for which Rice was convicted, they did—as we discuss below—participate in other ser-

ious misconduct: namely, intentional misrepresentations to the FCC regarding Rice's continued role.

■ Third, the licensees appeal to the "rehabilitation" factor, observing that the record contains no evidence of criminal activity subsequent to October 1990, and claiming that Rice's sexual misconduct ceased on that date. The lack of further misconduct after October, however, is hardly coincidental. In November, Rice was arrested on the assault charges. His forbearance from criminal activity during the period in which he awaited trial and was subject to the conditions of pretrial release is hardly indicative of rehabilitation.[4] Moreover, again as discussed below, the evidence shows that he participated in intentional misrepresentations to the FCC during this supposed rehabilitation period.

■ Fourth, the licensees point to Rice's "reputation in the community," noting that "four individuals who have known Mr. Rice personally and/or professionally for many years" submitted statements attesting to his good character and reputation. Br. of Appellants at 22. The ALJ properly refused to credit these statements, however, since only one mentioned Rice's felony conviction and none expressed any familiarity with its details. We cannot fault the FCC for concluding that those who vouched for Rice's character while evidencing little if any knowledge of his egregious acts cannot be regarded as credible on the subject.

■ Finally, the licensees complain that the FCC failed to award mitigation credit for the measures they took to prevent Rice from engaging in future misconduct, while simultaneously allowing him to "rehabilitate" himself through gainful employment. The licensees emphasize that they adopted resolutions prohibiting Rice from having any "managerial, policy, or

---

4. It goes without saying that Rice's forbearance while in prison is not indicative of rehabilitation at all.

consultative role" in their affairs, but that they also permitted him some "limited participation" in accordance with his physician's recommendations. *Id.* at 23–24. The problem with this argument is that the FCC concluded it was factually untrue, finding that Rice participated extensively in station affairs even after the resolutions were passed and that the licensees intentionally misrepresented that participation. As discussed in Part III.B below, we find substantial evidence to support the FCC's findings in this regard. The actions taken by the licensees, therefore, become elements of aggravation rather than mitigation.

■ In sum, we find no error in the FCC's evaluation of possible mitigating factors. The FCC considered each of the relevant factors set forth in its character policy, and it reasonably rejected all save one—the licensees' "overall record of compliance with FCC rules and policies." We agree with the Commission's conclusion that "[t]he fact that the Licensees have had a good overall record of FCC rule compliance is not alone sufficient to mitigate the overwhelming negative weight of all the other evidence" in this case. *Contemporary Media,* 13 F.C.C.R. at 14,445.

### B

■ At oral argument, the licensees conceded that if we were to sustain the FCC's finding of intentional misrepresentation, that alone would be sufficient ground for the revocation of their licenses. That concession was plainly correct, as "it is well recognized that the Commission may disqualify an applicant who deliberately makes misrepresentations or lacks candor in dealing with the agency." *Schoenbohm v. FCC,* 204 F.3d 243, 247 (D.C.Cir.2000); *see also FCC v. WOKO, Inc.,* 329 U.S. 223, 225–27, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *Swan Creek Communications, Inc. v. FCC,* 39 F.3d 1217, 1221–24 (D.C.Cir.1994); *Garden State Broad. Ltd. v. FCC,* 996 F.2d 386, 393–94 (D.C.Cir.

1993). We now turn to an examination of that issue.

■ The ALJ found, and the FCC affirmed, that the licensees "misrepresented and lacked candor in reporting to the Commission that, subsequent to his arrest, Rice was completely excluded from any further involvement in the management and operation of the Licensees' radio stations." *Contemporary Media,* 13 F.C.C.R. at 14,454; *see Contemporary Media, Inc.,* 12 F.C.C.R. 14,254, 14,295 (1997) (initial decision of ALJ). The licensees counter by claiming that they never promised "to completely exclude Mr. Rice from having any involvement in their stations' activities, only to exclude him from having any involvement in the management, policy, and day-to-day *decisions* involving the stations." Br. of Appellants at 25 (emphasis in original). They admit that this distinction is "subtle." *Id.* That is an understatement.

As previously recounted, in June 1991 the licensees reported to the FCC that:

*Since Mr. Rice's hospitalization on April 3, 1991, he has had absolutely no managerial, policy, or consultative role in the affairs of the three broadcast corporations* in which he has ownership interests and officer positions. In other words, pending a resolution of the referenced criminal charges, Mr. Rice is being completely insulated and excluded from any involvement in the managerial, policy, and *day-to-day decisions* involving any of the four licensed stations and three construction permits held by the three corporations.

J.A. at 15–16, 120 (citation omitted) (emphasis added). There is no dispute that from April until October 1991, the period of his hospitalization, Rice had no involvement with the stations. The licensees concede, however, that several weeks after Rice's release from the hospital, their vice-president permitted him to undertake a number of station-related tasks, which they describe as "occasional and isolated technical projects." Br. of Appellants at

26. Nonetheless, the next report to the FCC, filed on May 14, 1992, stated:

> There has been no change in Mr. Rice's status with [the reporting licensee] or in the status of the proceedings against him. . . . Mr. Rice is no longer hospitalized, but he continues to be treated by his physicians as an outpatient, and he continues to have no managerial or policy role in the affairs of the three broadcast corporations . . . in which he has ownership interests and corporate positions.

J.A. at 126–27 (citation omitted) (emphasis added).

According to the licensees, Rice's conceded involvement in "technical projects" is consistent with this representation because that involvement did not comprise managerial or decision-making activities but rather "mere opining and musings." Br. of Appellants at 28. The key point that the "hypertechnical" FCC overlooked, they claim, is that the May 1992 report deleted the word "consultative" from the list of roles from which the June 1991 report had said Rice was being excluded. Id. at 26. In their eyes, this "critical distinction" between the two reports should have put the Commission on notice that Rice had moved from having no role to having an "opining and musing" role. Id. at 27. Indeed, the licensees maintain that this distinction rendered their representations "fully forthcoming" and candid. Id. at 26.

By this time, it should be quite clear who is being "hypertechnical." Only a side-by-side, line-by-line comparison of the two filings—conducted with some skepticism of the licensees' candor—would have detected the subtle difference in language upon which the licensees now rely. In 1992, however, the FCC had no reason to conduct such a forensic comparison of the two representations, particularly in light of the May report's opening declaration that

"[t]here has been no change in Mr. Rice's status." That declaration, alone, was plainly false.[5]

Moreover, even if we were to accept that the licensees effectively advised the Commission that Rice was involved in consultation but had no role in management, there is substantial evidence in the record that Rice was involved in management as well. Cf. WEBR, Inc. v. FCC, 420 F.2d 158, 164 (D.C.Cir.1969) (holding that questions regarding misrepresentations are factual questions subject to substantial evidence review). As the ALJ stated:

> Apart from Rice's consultative role, the evidence establishes that, after his release from the hospital in October 1991, Rice was also involved in at least some of the programming matters and personnel decisions of the Licensees, rejected offers to purchase one of the Licensees' construction permits, invited an offer to purchase a station once it went on the air, suggested the trade of specific broadcast properties, and directed the group program director and two of the general managers of the Licensees' stations to perform certain tasks.

Contemporary Media, 12 F.C.C.R. at 14,-298.

The licensees contend that there was only "conflicting" evidence on these matters, pointing out that their witnesses disputed much of the testimony upon which the ALJ's conclusions were based. As a consequence, they argue, "[w]itness credibility findings played a predominant role in the ALJ's and the FCC's adverse rulings under the misrepresentation issue." Br. of Appellants at 30. It is true, of course, that when witnesses present conflicting testimony an agency's decision must be based on an evaluation of their credibility. Under our precedents, however, we defer to credibility findings affirmed by the Commission unless they are "pat-

---

**5.** At oral argument, the licensees argued that their intention was only to indicate that there had been no change in Rice's "ownership or managerial" status. The quoted words, however, do not appear in the declaration, which was completely unqualified.

ently unsupportable." *E.g., SL Communications, Inc. v. FCC,* 168 F.3d 1354, 1357 (D.C.Cir.1999). That is not the case here.

■ Finally, the licensees contend that "intent to deceive" is a necessary element of proving misrepresentation or lack of candor in FCC proceedings, *see Swan Creek Communications,* 39 F.3d at 1222; *Fox River Broad., Inc.,* 93 F.C.C.2d 127, 129 (1983), and that there is no credible record evidence of any intent on their part to mislead or deceive the agency. The evidence discussed above, however, is more than sufficient to support the Commission's finding that there was an intent to deceive. As we have stated before, "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity [is] enough to justify a conclusion that there was fraudulent intent." *Leflore Broad. Co.,* 636 F.2d at 462. The licensees concede that they intentionally deleted the word "consultative" from the 1992 filing, and we cannot credit the claim that they did not realize the resulting report would affirmatively mislead the agency as to Rice's resumption of such activities. Moreover, as noted above, there is substantial evidence that the licensees' representations concerning Rice's exclusion from non-consultative (i.e., managerial and policy) activities were themselves false. There is also substantial evidence that the licensees' management knew the representations were false, since management was on the receiving end of Rice's directives.[6] Accordingly, we uphold the FCC's finding of intent to deceive, and with it the Commission's determination

that the licensees' misrepresentations warranted revocation.

**IV**

■ Finally, we turn to the licensees' contention that the revocation of their licenses and construction permits violates the Excessive Fines Clause of the Eighth Amendment.[7] In support of this contention, the licensees cite *Austin v. United States,* which held that the Excessive Fines Clause applies to forfeitures under 21 U.S.C. § 881(a)(4) and (a)(7) of property used to facilitate drug transactions. *See* 509 U.S. 602, 604, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). *Austin* has no application here.

In *Austin,* the Court held that the central question under the Excessive Fines Clause is whether the government action at issue is "punishment for some offense." *Id.* at 609–10, 113 S.Ct. 2801; *see United States v. Bajakajian,* 524 U.S. 321, 327–28, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). In concluding that the forfeitures in that case constituted punishment, the Court focused on the historical understanding of forfeiture as a penal measure, an understanding reflected in prior Supreme Court precedents and in the legislative history of the forfeiture statute. *See Austin,* 509 U.S. at 614–20, 113 S.Ct. 2801.

These considerations do not apply to the case at bar. First, the Court's precedents do not reflect an understanding that FCC license revocations or nonrenewals based on character considerations constitute punishment. To the contrary, in *FCC v. WOKO,* the Court rejected just such a claim. *See* 329 U.S. at 228, 67 S.Ct. 213.

---

6. To take just a few examples:

Rice informed [vice president] Cox that he wanted Rhea [the general manager of two of his radio stations] fired, and Cox told Rhea that he was being fired because of Rice's displeasure ... ; Cox told Rhea that Rice wanted [radio announcer] Steel fired after Steel changed [his station's] reporting status in a trade publication; after Rice asked Rhea for information about the cost of the Satellite Music Network, Cox told Rhea that Rice thought [one of the stations]

could be programmed for less money by bringing in Rice's own music; and Leatherman [the general manager of another licensee station] responded to Cox after Rice asked him about the need for sound effects CDs.

*Contemporary Media,* 13 F.C.C.R. at 14,458.

7. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed....").

There, an FCC licensee who had made misrepresentations to the agency contended that the resulting nonrenewal order "inflict[ed] a penalty, that the motive [was] punishment." *Id.* The Court disagreed, stating: "A denial of an application for a license because of the insufficiency or deliberate falsity of information lawfully required to be furnished is not à penal measure." *Id.* Nor have the licensees cited anything in the legislative history of the Federal Communications Act to suggest that Congress had a punitive purpose.

The FCC revokes a license not to punish a licensee for its conduct, but because that conduct indicates to the Commission that the licensee is no longer qualified to hold it. *See* 47 U.S.C. §§ 303(*l*), 308, 312; *Contemporary Media*, 13 F.C.C.R. at 14,459–60. Revocation comes when the Commission concludes that the licensee can no longer be trusted to deal with it honestly, to follow its regulations, and to operate in the public interest. *See, e.g., Syracuse Peace Council v. FCC*, 867 F.2d 654, 659 n. 2 (D.C.Cir.1989); *Leflore Broad. Co.*, 636 F.2d at 461–62. While the revocation of FCC license privileges "may hurt and … may cause loss," *WOKO*, 329 U.S. at 228, 67 S.Ct. 213, it does not implicate the Excessive Fines Clause of the Eighth Amendment.

## V

For the foregoing reasons, we affirm the decision and order of the Federal Communications Commission.