**Greg RUGGIERO, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 00–1100.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 2002.

Decided Jan. 31, 2003.

Robert T. Perry argued the cause for petitioner. With him on the briefs was Barbara J. Olshansky.

Jacob M. Lewis, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were Robert S. Greenspan and Mark S. Davies, Attorneys, and Jane E. Mago, General Counsel, Federal Communications Commission, and C. Grey Pash, Jr., Counsel.

Before: GINSBURG, Chief Judge, and EDWARDS, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court by Chief Judge GINSBURG, with whom Circuit Judges HARRY T. EDWARDS, SENTELLE, KAREN LeCRAFT HENDERSON, RANDOLPH, ROGERS, and GARLAND join.

Concurring opinion filed by Circuit Judge RANDOLPH.

Concurring opinion filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge TATEL.

GINSBURG, Chief Judge:

This petition for review challenges the constitutionality of the character qualification provision of the Radio Broadcasting Preservation Act of 2000, which makes ineligible for a low-power FM (LPFM) radio license anyone who engaged in "the unlicensed operation of any station in violation of ... the Communications Act of 1934." Pub.L. No. 106–553, 114 Stat. 2762, § 632(a)(1)(B). The petitioner raises a facial challenge to the statute and to the regulations that implement it, asserting that they are overinclusive or, alternatively, underinclusive, in violation of the First Amendment to the Constitution of the United States. A divided panel granted the petition. The full court then vacated the judgment issued by the panel and reheard the case en banc. We now uphold the constitutionality of the character qualification and deny the petition for review.

## I. Background

Since 1927 the Congress has prohibited any person from operating a radio station without a license issued by the Federal Communications Commission (or its predecessor, the Federal Radio Commission). *See* 47 U.S.C. § 301. The Commission is to grant a broadcast license only if the "public interest, convenience, and necessity would be served," 47 U.S.C. § 309(a), and only if the applicant "set[s] forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station." 47 U.S.C. § 308(b).

In 1948, the Commission first licensed noncommercial LPFM stations operating at a maximum of ten watts. Some 30 years later, when the Commission determined that highpower FM stations could use the channels more efficiently by "serv[ing] larger areas, and bring[ing] effective noncommercial educational radio service to many who ... lack[ed] it," *Changes in the Rules Relating to Noncommercial Educ. FM Broad. Stations*, 69 F.C.C.2d 240, ¶ 24, 1978 WL 35965 (1978), *modified*, 70 F.C.C.2d 972, 1979 WL 44256 (1979) (codified at scattered sections of 47 C.F.R.), the Commission stopped licensing LPFM stations and required most existing LPFM stations to move to commercial frequencies or to upgrade to at least 100 watts. *Id.* at ¶¶ 11–32.

Thereafter, numerous individuals and entities began operating LPFM stations without a broadcast license. In many cases these so-called "pirate" broadcasters operated their stations in open defiance of the Commission's ban on LPFM broadcasts. In response, the Commission dedicated considerable resources to enforcing the license requirement. Notwithstanding, however, the array of powers the Commission had to combat unlicensed broadcasting, including the authority to seek an injunction, 47 U.S.C. § 401(b), to issue a cease-and-desist order, 47 U.S.C. § 312(b), to seize equipment used in unlicensed broadcasting, 47 U.S.C. § 510(a), and to impose a monetary forfeiture, 47 U.S.C. § 503(b), the problem persisted and

indeed grew worse in the 1990s. In 1998, 1999, and the first two months of 2000 the Commission shut down, on average, more than a dozen unlicensed radio stations each month. *FCC's Low Power FM: A Review of the FCC's Spectrum Management Responsibilities: Hearing on H.R. 3439 Before the Subcomm. on Telecomm., Trade, and Consumer Protection of the House Comm. on Commerce*, 106th Cong. 85 (2000). In that same period unlicensed radio operations using uncertified equipment disrupted air traffic control communications at Sacramento and interfered with such communications at the Miami and West Palm Beach airports. *Creation of a Low Power Radio Serv.*, 14 F.C.C.R. 2471, ¶ 65, 1999 WL 46878 (1999) (Notice of Proposed Rule Making) (hereinafter Low Power Proposal). Therefore, it was clear to the Commission that action needed to be taken to stop unlicensed broadcasting.

In 1999 the Commission proposed to modify its low-power radio rules and sought public comment upon whether it should "create two classes of low power radio service, both of which would operate in the existing FM radio band: a 1000-watt primary service and a 100-watt secondary service." *Id.* at ¶ 1. The Commission also sought comment upon whether it should establish "a third, 'microradio' class of low power radio service that would operate in the range of 1 to 10 watts." *Id.* at ¶ 1.

After receiving many comments concerning the Low Power Proposal, the Commission issued an order creating new 100-watt and 10-watt classes of LPFM stations. *Creation of Low Power Radio Serv.*, 15 F.C.C.R. 2205, ¶ 11, 2000 WL 85304 (2000) (Report and Order). The Commission also stated that it would accept a low-power application from an applicant who had broadcast without a license in the past if the applicant certified under

penalty of perjury that it had ceased such operations within 24 hours of being directed to do so by the Commission and no later than the deadline (February 26, 1999) set out in the Low Power Proposal. *Id.* at ¶ ¶ 53–54. This licensing condition for broadcast pirates was applicable both to individuals and to corporate applicants, including the applicant's officers and directors. *Id.* at ¶ 54.

The Commission's proposal conditionally to license former pirates was received with dismay in the Congress. Senator Gregg, who introduced a bill to repeal the LPFM rules in toto, argued against the Commission's character qualification in particular: "mak[ing] formerly unlicensed, pirate radio operators eligible for LPFM licenses," he said, would "reinforce[ ] their unlawful behavior and encourage[ ] future illegal activity by opening the door to new unauthorized broadcasters." 146 Cong. Rec. S613–02 (daily ed. Feb. 10, 2000). Congressman Oxley made the same argument at a House committee hearing on a similar bill. *See* House Hearing, 106th Cong. at 4. *See also* H.R.Rep. No. 106–567, 106th Cong., at 8 (2000) (House Committee on Commerce concluded "that the operation of an unlicensed station demonstrates a lack of commitment to follow the basic rules and regulations which are essential to having a broadcast service that serves the public, and those individuals or groups should not be permitted to receive licenses in the LPFM service").

The Congress ultimately responded to the Commission's decision by enacting the Radio Broadcast Preservation Act of 2000 (RBPA), Pub.L. No. 106–553, 114 Stat. 2762, § 632, which among other things directed the Commission to modify its rules to "prohibit any applicant from obtaining a low-power FM license if the applicant has engaged in any manner in the unlicensed operation of any station in violation of

section 301 of the Communications Act of 1934." *Id.* § 632(a)(1)(B). In contrast to the Commission, that is, the Congress barred all low-power pirates from obtaining an LPFM license regardless whether or when they had ceased to operate unlawfully.

As directed, the Commission modified its rules to implement the more stringent character qualification required by the Congress. *Creation of Low Power Radio Serv.,* 16 F.C.C.R. 8026, ¶ 10, 2001 WL 310997 (2001) (Second Report and Order). The resulting regulation provides that "[n]o application for an LPFM station may be granted unless the applicant certifies, under penalty of perjury, that neither the applicant, nor any party to the application, has engaged in any manner including individually or with persons, groups, organizations or other entities, in the unlicensed operation of any station in violation of Section 301 of the Communications Act of 1934." 47 C.F.R. § 73.854.

Ruggiero, an admitted former pirate, sought review in this court of the Second Report and Order, arguing that the character qualification on its face violates the First Amendment. A divided panel of this court held the RBPA and the implementing regulation unconstitutional. *Ruggiero v. FCC,* 278 F.3d 1323 (D.C.Cir.2002). We granted the Commission's petition for rehearing en banc and vacated the prior judgment. Having now reheard the case en banc, we adopt the decision of the panel concerning the jurisdiction of the court, *id.* at 1327–29, but on the merits hold that the character qualification provision is neither overinclusive nor underinclusive in violation of the First Amendment.

## II. Analysis

Before we turn to the merits of the constitutional question, we must identify the level of first amendment scrutiny ap-propriate to the nature of the statute being challenged.

### A. Standard of Review

■ Ruggiero asserts that under *FCC v. League of Women Voters,* 468 U.S. 364, 399, 104 S.Ct. 3106, 3127, 82 L.Ed.2d 278 (1984), we are to apply "intermediate scrutiny" to all broadcast regulations other than those that are purely "structural," that is, those involving the "where" and "when" of broadcasting. Under the rubric of intermediate scrutiny we would have to determine whether the LPFM character qualification is "narrowly tailored to further a substantial governmental interest." *Id.* at 380, 104 S.Ct. at 3118. Alternatively, Ruggiero asserts the court should apply the "heightened rational basis scrutiny" to which we alluded, but had no occasion to apply, in *News America Publishing Inc. v. FCC,* 844 F.2d 800, 814 (D.C.Cir.1988). For its part, the Commission argues we should apply the "rational basis standard" associated with minimal scrutiny and hence need only determine whether the character qualification is "a reasonable means of promoting the public interest." *FCC v. National Citizens Comm. for Broad.,* 436 U.S. 775, 802, 98 S.Ct. 2096, 2115, 56 L.Ed.2d 697 (1978) (*NCCB*).

We conclude, as did the panel that first heard this case, that the appropriate standard of review occupies a ground somewhere between the minimal scrutiny advocated by the Commission and the intermediate scrutiny proposed by Ruggiero. First, we reject Ruggiero's principal argument, namely, that the character qualification is content-based and therefore, pursuant to *League of Women Voters,* subject to intermediate scrutiny. At issue in that case was a statute prohibiting noncommercial educational stations from editorializing, 47 U.S.C. § 399, a ban "defined solely on the basis of the

content of the suppressed speech." 468 U.S. at 383, 104 S.Ct. at 3119. Because the object of the anti-editorial statute was content, the Supreme Court gave it intermediate scrutiny, asking whether the restriction was narrowly tailored to advance a substantial government interest. The ban on editorials failed that test twice over: it was both overinclusive and underinclusive. The ban was overinclusive in that it prohibited speech "on topics that [did] not take a directly partisan stand or that ha[d] nothing whatever to do with ... government," *id.* at 395, 104 S.Ct. at 3125, and thus did not implicate the Government's stated interests in (a) protecting broadcasters from government interference and (b) preventing the public from assuming the editorials represented the view of the Government. The statute was underinclusive in that broadcasters could still present controversial or partisan views in news and other programming. *Id.* at 396, 104 S.Ct. at 3125–26. *See also Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (applying intermediate scrutiny to ban on broadcast advertising of private casino gambling as restriction on content of commercial speech).

. In contrast, as the Commission correctly points out, the character qualification at issue in this case applies without regard to any content the applicant may have broadcast unlawfully or might be expected to broadcast if a license were issued to him. The character qualification is triggered solely by the applicant's conduct, specifically, having "engaged ... in the unlicensed operation of any station in violation of section 301 of the Communications Act." Pub.L. No.106–553, 114 Stat. 2762, § 632(a)(1)(B). Contrary to Ruggiero's brief, the character qualification is not directed at the alleged "viewpoint espoused by many pirates" that "civil disobedience in the form of unlicensed broadcasting

[was] ... necessary to prod the FCC to rescind its longstanding ban on low power FM radio broadcasting." Rather, the statute on its face is based solely upon the applicant's prior lack of compliance with the licensing requirement; the character qualification applies equally to all unlicensed broadcasters regardless of the motivation for, or the message disseminated by, their illegal broadcasting. *See Employment Div. v. Smith,* 494 U.S. 872, 878, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990) ("[I]f prohibiting the exercise of religion ... is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended"). *See also Kahn v. United States,* 753 F.2d 1208, 1216 (3d Cir.1985) (prosecution of taxpayer for filing fraudulent tax return, as act of civil disobedience, did not violate First Amendment; "penalty was imposed because the taxpayer's *conduct* failed to comply with the requirement of the tax laws that she properly report her tax liability, not because she expressed unpopular political views") (emphasis in original).

■ Though we reject Ruggiero's assertion that intermediate scrutiny applies, we do not embrace the Commission's position that only minimal scrutiny is warranted. Minimal scrutiny is appropriate to the indirect effect upon speech that may attend "structural" regulation of the broadcast industry. *See Leflore Broad. Co. v. FCC,* 636 F.2d 454, 458 n. 26 (D.C.Cir.1980) (structural regulations "insure diversity in broadcasting while minimizing government attention to broadcast content"). In *NCCB,* upon which the Commission relies, the Supreme Court gave only minimal scrutiny to and upheld the Commission's newspaper-broadcast cross-ownership rule, which prohibited common ownership of a broadcast station and a daily newspaper in the same community. 436 U.S. at 779, 98

S.Ct. at 2104. The cross-ownership rule, however, merely constrained the newspaper publisher's choice of the community in which to own a radio or television station; it did not prohibit the publisher from broadcasting altogether. *Id.* at 800, 98 S.Ct. at 2115 ("Under the regulations ... a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community"). The RBPA, in contrast, makes the pirate broadcaster ineligible to obtain an LPFM license – the only type of license practicably available to most individuals – in any community. It is the would-be speaker's inability to broadcast at all that takes this case outside the "structural" framework and makes minimal scrutiny insufficiently rigorous to protect the freedom of speech protected by the First Amendment.

■ Having rejected each party's favored standard of review, we, like the panel that first heard this case, "find ourselves in a middle ground, sure only that the appropriate standard is neither *NCCB*'s minimal scrutiny nor *League of Women Voters'* intermediate scrutiny." 278 F.3d at 1331. Clearly, as Ruggiero suggests in his alternative argument, something more than minimal rationality is required to uphold the statute. *Id.*; *News America*, 844 F.2d at 814. We need not be more precise, however, because we conclude that the character qualification provision is reasonably tailored to satisfying a substantial government interest, and that is surely enough to uphold a prohibition upon broadcast speech that, although complete within its limited sphere, is in no respect content-based.

### B. Under- and Overinclusiveness

As the Commission points out, unlicensed LPFM transmissions can not only prevent the public from receiving the signals of licensed broadcasters, *see, e.g.*, *United States v. Any and All Radio Sta-*

*tion Transmission Equip.*, 204 F.3d 658 (6th Cir.2000) (interference complaint against pirate by licensed FM station); they can also, as we have seen, interfere with "public safety communications and aircraft frequencies." Low Power Proposal, 14 F.C.C.R. 2471, at ¶ 65. Because the Government has chosen to address the problem of interference through socialization and administrative allocation of the right to broadcast, rather than relying upon the common law, *see* Thomas W. Hazlett, *The Rationality of U.S. Regulation of the Broadcast Spectrum*, 33 J.L. & ECON. 133, 148–52 (1990); and Ronald H. Coase, *The Federal Communications Commission*, 2 J.L. & ECON. 1, 14 (1959) (treating problem of interference as he would later treat other incompatible uses in *The Problem of Social Cost*, 3 J.L. & ECON. 1 (1959)), there can be no doubt it has a substantial interest in ensuring compliance with the Communications Act and in particular with its central requirement of a license to broadcast.

Ruggiero argues, nonetheless, that the character qualification is impermissibly underinclusive because it does not disqualify persons guilty of "serious misconduct other than piracy – murder, rape, child abuse, bribery, fraud, illegal wiretapping, antitrust violations, [and] lying to the FCC, to give but a few examples." He continues in the same vein:

> Because Congress has ignored a broad range of misconduct "giving rise to precisely the same harm that supposedly motivated it to [enact the character qualification provision]," *Sanjour v. EPA*, 56 F.3d [85,] 95 [ (D.C.Cir.1995) (en banc) ], it is "serious[ly] doubt[ful]" that the character qualification provision substantially advances the governmental interest in increasing compliance with

broadcast laws and regulations in a meaningful way.

This is nonsense on stilts.

First, Ruggiero's factual premise is incorrect, not to say absurd. The Congress has not "ignored" misconduct "giving rise to precisely the same harm" that caused it to impose the character qualification. Not only are murderers, rapists, child molesters, and the like not particularly associated with the harms caused by unlicensed broadcasting, the harms that these malefactors do cause are not without other and more severe penalties (state or federal) than ineligibility for an LPFM license.

Second, it was entirely reasonable for the Congress to make the policy judgment that all broadcast pirates, and only broadcast pirates, should be disqualified categorically from holding an LPFM license while leaving to the Commission the discretion to evaluate on a case-by-case basis the myriad other ways an applicant's character can be drawn into question. All broadcast pirates, by definition, have violated already the requirement of obtaining a broadcast license. As Judge Henderson pointedly asked in her dissent from the decision of the panel, "[w]hat could be more reasonable or logical than to suspect that those who ignored the Commission's LPFM broadcast regulations in the past are likely to do so in the future and therefore to head them off[?]" 278 F.3d at 1335. Indeed, even as it adopted its own more forgiving approach to pirates before the Congress enacted the RBPA, the Commission acknowledged that "past illegal broadcast operations reflect on that entity's proclivity to deal truthfully with the Commission and to comply with our rules and policies, and thus on its basic qualifications to hold a license." 15 F.C.C.R. 2205, at ¶ 54. Thus the Congress could reasonably conclude that other violations of law simply do not reflect as directly upon the offender's qualification to hold an LPFM license. Moreover, insofar as such criminals may seek LPFM (or indeed any type of broadcast) licenses, they are, as the Commission notes, "subject to the FCC's [general] character qualification policy, under which they are likely to be disqualified for such serious crimes in any event." *See Policy Regarding Character Qualifications in Broad. Licensing,* 102 F.C.C.2d 1179, ¶ ¶ 34–44, 1986 WL 292574 (1986); *see also, e.g., In re Contemporary Media, Inc.,* 12 F.C.C.R. 14254, 1997 WL 473323 (1997) (revocation of license and denial of application for new license because principal had been convicted of sexual abuse of children), *aff'd, Contemporary Media, Inc. v. FCC,* 214 F.3d 187, 193 (D.C.Cir.2000). Therefore, we can hardly say the Congress was prohibited by the First Amendment from responding to the discrete problem of broadcast piracy – which goes to the heart of the Communications Act, namely, preventing interference caused by unlicensed broadcasting – with a categorical ban.

■ Third, even if it could be thought that categorically disqualifying murderers and the like from getting an LPFM license would deter some unlicensed broadcasting, "a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict ... the speech of *more* people, could be more effective." *Blount v. SEC,* 61 F.3d 938, 946 (D.C.Cir. 1995) (emphasis in original). In sum, we agree with the Commission's position that the character qualification provision of the RBPA is not underinclusive but is, rather, because it targets those who have already violated the broadcast license requirement, reasonably tailored to further the Government's substantial interest in minimizing unlicensed LPFM broadcasting.

We reject also Ruggiero's claim that the character qualification is overinclusive because it prohibits all pirates, including those good pirates who stopped broadcast-

ing illegally when ordered to do so, and those "former pirates [who] subsequently have become model citizens," from obtaining a license. All unlicensed LPFM broadcasters violated the Communications Act. Any unlicensed broadcasting demonstrates a willful disregard of the most basic rule of federal broadcasting regulation. *See* H.R.Rep. No. 106–567, at 8 (2000); *Creation of Low Power Radio Service,* 15 F.C.C.R. 19208, ¶ 96, 2000 WL 1434686 (2000) (Opinion and Order). The Congress did not hit wide of the mark, therefore, when it treated all pirates alike.\*

## C. Equal Protection

■ Ruggiero also claims that because the character qualification "imposes special burdens on the First Amendment rights of a single class of speakers (pirates)," and is not " 'narrowly tailored' to serve a 'substantial' governmental interest," it violates the Equal Protection guarantee of the Fifth Amendment. This claim fails for the same reasons the first amendment claims fail: the legislative classification, which treats former pirates differently from others, is reasonably tailored to the govern-

ment's substantial interest in protecting the broadcast spectrum.

Although equal protection analysis focuses upon the validity of the classification rather than the speech restriction, "the critical questions asked are the same." *Community–Service Broad. of Mid–America, Inc. v. FCC,* 593 F.2d 1102 (D.C.Cir. 1978) (en banc). We believe that the same level of scrutiny, heightened rational basis, is therefore appropriate in both contexts, and that the policy withstands such scrutiny.

## III. Summary and Conclusion

The character qualification of the RBPA is a targeted response to the problem of pirate broadcasting, affects only those who violated the license requirement, and does so utterly without regard to the content of, or any view expressed by, their unlicensed broadcasts. There is a reasonable fit between the character qualification and the Government's substantial interests in deterring unlicensed broadcasting and preventing further violations of the regulations applicable to broadcasters. Accordingly, we hold that § 632(a)(1)(B) of the

---

\* Although necessarily couched in terms of under- and overinclusiveness, our dissenting colleague's concern seems really to be with what he sees as the disproportionality of disqualifying LPFM pirates from holding an LPFM license, as compared with the consequences visited upon other unlicensed broadcasters and other offenders against the broadcast regulatory regime. *See* dissent at 245, asking "why does the RBPA's automatic and permanent ban not extend to unlicensed full power broadcasters"; and at 246, where he "agree[s] that deterrence is a substantial governmental interest, but [asks] why impose a lifetime ban?," which he refers to as "a broadcasting 'mark of Cain.' "

The judgment that one offense is more serious than another, like the judgment that a punishment of a certain severity is warranted for a particular offense, is not for the judiciary to make. *Cf. Hutchins v. District of Colum-*

*bia,* 188 F.3d 531, 543 (D.C.Cir.1999) (noting that under intermediate scrutiny, "the [Government] is not obliged to prove a precise fit between the nature of the problem and the legislative remedy," and rejecting claim that curfew was unconstitutional because it did not include 17–year-olds); *Schleifer v. City of Charlottesville,* 159 F.3d 843, 850 (4th Cir. 1998) (applying intermediate scrutiny and rejecting claim that city's decision to exclude 17–year-olds from curfew was unconstitutional, because "[i]t is not the function of a court to hypothesize independently on the desirability or feasibility of any possible alternative[s] to the statutory scheme" (quoting *Lalli v. Lalli,* 439 U.S. 259, 274, 99 S.Ct. 518, 528, 58 L.Ed.2d 503 (1978))). Our concern in this case is limited to whether the Congress has reasonably tailored the character qualification to fit the substantial government interest it is intended to serve.

RBPA and the regulation implementing it do not on their faces violate the First Amendment. The petition for review is, accordingly,

*Denied.*

RANDOLPH, Circuit Judge, concurring:

Ruggiero has two First Amendment arguments. The first is that the statutory and regulatory bar against granting a low-power FM broadcast license to anyone who illegally operated without one is overbroad. The second is that the bar is underinclusive. I write separately because, in my view, he is not entitled to make the first argument; and his second argument misconceives First Amendment doctrine.

Ruggiero has not applied to the FCC for a low-power license. He does not claim that his particular circumstances would warrant any special treatment. His attack is on the face of the statute and the implementing regulations. The lifetime bar is overbroad, he claims, because there may be applicants who "briefly or long ago engaged in unlicensed broadcast operations" and who now have become "model citizens." Petitioner's Br. at 26. The court rejects Ruggiero's claim on the ground that Congress rationally treated all pirates alike. Maj. op. at 246–47. Although I agree with the court, I believe another rationale leads to the same result.

Litigants ordinarily do not have standing to raise the rights of others. But in arguing about hypothetical third parties, Ruggiero is in effect invoking the familiar overbreadth doctrine, a staple of First Amendment jurisprudence. The doctrine, which may be traced to *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), permits facial challenges brought on the ground that the statute or regulation reaches constitutionally protected speech of parties not before the court. If the statute is substantially overbroad—

that is, if it abridges protected speech of others in a good number of cases—the statute is unconstitutional. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612–15, 93 S.Ct. 2908, 2915–18, 37 L.Ed.2d 830 (1973). Overbreadth is sometimes viewed as an exception to traditional standing rules. *See Bd. of Trustees of the State Univ. of New York v. Fox,* 492 U.S. 469, 482–84, 109 S.Ct. 3028, 3035–37, 106 L.Ed.2d 388 (1989); *Los Angeles Police Dep't v. United Reporting Publ'g Corp.,* 528 U.S. 32, 38, 120 S.Ct. 483, 488, 145 L.Ed.2d 451 (1999). The doctrine rests on the assumption that if a statute could not be challenged for overbreadth, those not before the court would be chilled and would refrain from exercising their First Amendment rights. *See generally New York v. Ferber,* 458 U.S. 747, 766–73, 102 S.Ct. 3348, 3359–63, 73 L.Ed.2d 1113 (1982). The "principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application *to someone else.*" *Fox,* 492 U.S. at 483, 109 S.Ct. at 3036. The Supreme Court has treated the doctrine as " 'strong medicine' " to be employed " 'only as a last resort.' " *Ferber,* 458 U.S. at 769, 102 S.Ct. at 3361 (quoting *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916–17).

The assumption underlying the overbreadth doctrine is inapplicable here. There is no possibility that third parties could be chilled in the exercise of their First Amendment rights. *See Bates v. State Bar of Ariz.,* 433 U.S. 350, 380–81, 97 S.Ct. 2691, 2707–08, 53 L.Ed.2d 810 (1977). We are not dealing with a criminal provision. All that is involved is filing an application with the FCC. Many pirates have done so. *Creation of a Low Power Radio Serv.,* 16 F.C.C.R. 8026, 8030, 8060, 2001 WL 310997 (2001). If they file applications in the future no harm will befall them. Their applications will simply be denied.

There is in short no chilling effect and Ruggiero therefore cannot invoke the overbreadth doctrine. *See Los Angeles Police Dep't,* 528 U.S. at 38–41, 120 S.Ct. at 488–90; *United States v. Hsia,* 176 F.3d 517, 523 (D.C.Cir.1999). Without the benefit of the doctrine, he can succeed in his facial challenge only if he establishes "that no set of circumstances exists under which the Act [and the implementing regulations] would be valid," *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *see Amfac Resorts, L.L.C. v. U.S. Dep't of Interior,* 282 F.3d 818, 826 (D.C.Cir.), *cert granted sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior,* —— U.S. ——, 123 S.Ct. 549, 154 L.Ed.2d 424 (2002) ; *James Madison Ltd., by Hecht v. Ludwig,* 82 F.3d 1085, 1101 (D.C.Cir.1996); *Chem. Waste Mgmt., Inc. v. EPA,* 56 F.3d 1434, 1437 (D.C.Cir.1995); *Steffan v. Perry,* 41 F.3d 677, 693 (D.C.Cir. 1994) (en banc); *but see INS v. Nat'l Ctr. for Immigrants' Rights,* 502 U.S. 183, 188, 112 S.Ct. 551, 555, 116 L.Ed.2d 546 (1991). This is a burden Ruggiero admits he cannot meet. He has conceded that "some former pirates may lack the requisite character traits to hold [low-power] licenses." Petitioner's Reply Br. at 11. Ruggiero himself committed "three-year-long, nearly continuous violations of the licensing requirement," *Free Speech v. Reno,* No. 98 Civ. 2680 (MBM), 1999 WL 147743, at *11 (S.D.N.Y. Mar.18, 1999), *aff'd sub nom. Free Speech ex rel. Ruggiero v. Reno,* 200 F.3d 63 (2d Cir.1999), and hardly qualifies as a pirate who "briefly" operated without a license.

As against this, the dissent has two responses. The first is that Ruggiero is not really mounting an overbreadth challenge; the second is that he is entitled to mount an overbreadth challenge because others may be chilled from applying for a license since this requires disclosing past broadcasting violations. Dissent at 260–62. Neither reply is correct. As to the nature of Ruggiero's argument, his attack is on the face of the statute and his claim is that the character qualification provision may not be applied to him because it would be unconstitutional to apply it to others not before the court. *E.g.,* Petitioner's Br. at 25–27; Petitioner's Reply Br. at 11. To put the matter more specifically, his argument—and the argument of the dissent—is that the statute cannot be validly applied to Ruggiero or anyone else, no matter how egregious their past violations, because there may be others whose violations were not so egregious. Ruggiero never claims that his past violations were not egregious; we know that they were. This then is a classic statement of an overbreadth claim. *See, e.g., Fox,* 492 U.S. at 482–84, 109 S.Ct. at 3035–37. The dissent says that Ruggiero is contending the statute "cannot constitutionally be applied to *anyone* because the statute *automatically* bars unlicensed microbroadcasters...." Dissent at 261. That indeed is his contention. But what the dissent fails to grasp is that in every overbreadth attack, the plaintiff claims the statute is unconstitutional with respect to everyone; that is the very nature of this sort of attack and of the relief it seeks—invalidation of the statute on its face. *See, e.g.,* KATHLEEN M. SULLIVAN & GERALD GUNTHER, FIRST AMENDMENT LAW 322 (1999). The dissent also suggests that in order to make a successful overbreadth attack, the plaintiff must concede that the statute can validly be applied to him. Dissent at 261. The Supreme Court has never imposed any such requirement. The Court simply assumes that even if the statute is constitutional as applied to the plaintiff, or even if another provision could be drawn with greater specificity, the statute might nevertheless be invalid because of its effect on others. *Ferber,* 458 U.S. at 769, 102 S.Ct. at 3361.

In the alternative, the dissent claims there is a chilling effect on others because

unlicensed broadcasters, in applying for a license, will be reluctant to disclose their past violations under penalty of perjury. Dissent at 261. The trouble for the dissent is that this particular chilling effect exists regardless whether the statute is upheld or struck down. Anyone applying for a license must be prepared to divulge past violations of Commission rules. Not even the dissent contends that unlicensed broadcasting is irrelevant to the Commission's decision whether to grant a license. The Commission's 1986 comprehensive policy statement on character qualifications for licensees states that "as a general matter any violations of the Communications Act, Commission rules or Commission policies can be said to have a potential bearing on character qualifications." *Policy Regarding Character Qualifications in Broadcast Licensing,* 102 F.C.C.2d 1179, 1209, 1986 WL 292574 (1986). And even before Congress passed the statutory bar we are considering, the Commission required applicants for low-power licenses to certify that they had not operated a station without a license. *Creation of a Low Power Radio Serv.,* 16 F.C.C.R. at 8030. The question here—a question the dissent does not address—is whether the statutory disqualification, by its very existence, deters more speech than did the preceding regime. And the answer to that question is clearly no. In short, the statute imposes no new "chilling effect" on the First Amendment rights of others, and as I have discussed, for that reason Ruggiero cannot bring an overbreadth challenge. Besides, the question here is not just whether there is some chilling effect—the claim must be that protected speech is being deterred. Yet there is no chilling effect on speech. "No one has a First Amendment right to a license," *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 389, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969), and it follows that no one has a First Amendment right to apply for a license.

As to underinclusiveness, Ruggiero's claim is that the bar violates the First Amendment because persons who have engaged in other sorts of serious misconduct are not automatically banned from obtaining a low-power license. The court dispatches this argument on the ground that Congress's judgment was reasonable. Maj. op. at 245–46. I agree, but believe there is an alternative answer. The First Amendment does not impose "an 'underinclusiveness' limitation[,] but a 'content discrimination' limitation upon a State's prohibition of proscribable speech." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 387, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992). In other words, the relevance of a statute's underinclusiveness is that it may reveal discrimination on the basis of viewpoint or content, or may undercut the statute's purported non-discriminatory purpose. *See id.; Republican Party of Minn. v. White,* 536 U.S. 765, 122 S.Ct. 2528, 2537, 153 L.Ed.2d 694 (2002); *City of Ladue v. Gilleo,* 512 U.S. 43, 52–53, 114 S.Ct. 2038, 2043–44, 129 L.Ed.2d 36 (1994). States could not, for instance, ban only fighting words that criticize a certain race. But the Court pointed out in *R.A.V.* that there would be no First Amendment problem whatever with a State's prohibiting obscenity in only certain media, although that would be underinclusive. 505 U.S. at 387, 112 S.Ct. at 2545. Here, there is no colorable claim that the statute and the regulation ban speech on the basis of content. As the court points out, the ban is based entirely on past violations, not on what the broadcaster said in the past or would say in the future if he were allowed to take to the airwaves again. Maj. op. at 244. I would therefore reject Ruggiero's underinclusiveness argument on this ground. For this reason I also view the dissent's discussion of underinclusiveness—which notes that not even murderers and rapists are automatically barred

from obtaining a license—as beside the point.

ROGERS, Circuit Judge, concurring:

Upon consideration of this appeal by the en banc court, I generally join Judge Randolph's concurring opinion. Based on the standard established in *News America Publishing, Inc. v. FCC*, 844 F.2d 800 (D.C.Cir.1988), as applied and explained in that case, I initially was persuaded by Ruggiero's argument challenging § 632(a)(1)(B) of the Radio Broadcasting Preservation Act of 2000, Pub.L. No. 106–553, 114 Stat. 2762, § 632(a)(1)(B), and its implementing rule, 47 C.F.R. § 73.854. However, upon further consideration, I am persuaded that Ruggiero does not have standing to raise the question of whether the statutory ban is overbroad. That conclusion, combined with the fact that the en banc court is not constrained by our precedent *News America*, precedent whose analysis I read to require a determination that the ban was unconstitutional, now leads me to a different result.

The court is in agreement that the *News America* standard of something "more than minimal scrutiny," 844 F.2d at 813, is the appropriate standard to be applied in Ruggiero's case, rejecting the rational basis test urged by the government. The court does not further define the standard and the majority, unlike the dissent, does not adopt the analysis of *News America*. In *News America*, the court did not address the question of overbreadth, resting instead on the extraordinary underinclusiveness of the statutory provision at issue that, in fact, applied to a single licensee. 844 F.2d at 810. The panel majority in *Ruggiero* adopted the *News America* standard because the statutory ban focused on a defined (albeit not closed) group "with the precision of a laser beam," *Ruggiero v. FCC*, 278 F.3d 1323, 1331 (D.C.Cir.2002), and concluded that the statute (and its associated rule) was unconstitutional under the *News America* standard in part because it "covers circumstances only marginally related to the purpose of increasing regulatory compliance," *id.* at 1332. The en banc majority eschews that conclusion and instead decides that because "[a]ll unlicensed LPFM broadcasters violated the Communications Act," they have "demonstrate[d] a willful disregard of the most basic rule of federal broadcasting regulation" and are properly covered by the statute and implementing rule. Maj. Op. at 247.

The differing applications of the overbreadth doctrine by the en banc majority and the panel majority suggest the importance of considering whether the doctrine properly applies at all to Ruggiero's appeal. *See L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38–41, 120 S.Ct. 483, 488–90, 145 L.Ed.2d 451 (1999). The en banc majority does not address this threshold question. Although the parties did not brief the issue of whether the overbreadth doctrine applies, the question was raised by the en banc court during oral argument and the parties' attention was drawn to the Supreme Court's decision in *Los Angeles Police Department*. Each party was afforded an opportunity to respond to the question and neither party sought permission from the court to file a supplemental memorandum on the question. As a jurisdictional issue that the court can raise *sua sponte*, insofar as the question implicates whether Ruggiero is a proper party to challenge the overbroad nature of the statute and rule, *see New York v. Ferber*, 458 U.S. 747, 767–68 & n. 20, 102 S.Ct. 3348, 3359–61 & n. 20 73 L.Ed.2d 1113 (1982), it behooves the court to address the threshold question of whether the doctrine applies here, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998).

For the reasons generally set forth in Judge Randolph's concurring opinion, I would deny the petition for review. In light of *Los Angeles Police Department,* the overbreadth doctrine does not apply. Although the dissent treats Ruggiero's challenge to the ban as based on underinclusiveness and overinclusiveness, and continues to apply the *News America* analysis, dissenting op. at 256–261, as Judge Randolph makes clear, one of Ruggiero's First Amendment challenges is an overbreadth challenge. Concurring op. Randolph, J. at 251, 252. There is no evidence that the speech of any pirate has been chilled as a result of the ban, and when counsel for Ruggiero was asked at oral argument what chilling effect the ban might have on other pirates, he was only able to identify the fact that "many of these individuals won't even bother to go through the process of applying for a broadcast license," because "[t]hey don't have a lot of money to hire lawyers." The financial inability of private parties to file suit to challenge arguably unconstitutional statutes is insufficient to show a chilling effect. Moreover, Ruggiero's own history with the Commission leaves no room for doubt that such a ban can be constitutionally applied to so flagrant a violator of the Communications Act. *See Free Speech v. Reno,* No. 98 CIV. 2680(MBM), 1999 WL 147743, at *11 (S.D.N.Y. Mar.18, 1999), *aff'd sub nom. Free Speech ex rel. Ruggiero v. Reno,* 200 F.3d 63 (2d Cir.1999); *In re Creation of Low Power Radio Serv.,* 15 F.C.C.R. 19,208, 19,245 & n. 140, 2000 WL 1434686 (2000), *amended by* 16 F.C.C.R. 8026, 2001 WL 310997 (2001). Indeed, the dissent does not suggest to the contrary, but would void the ban because it is not confined to flagrant violators. Dissenting op. at 259–260. Thus his facial challenge fails. *See* concurring op. Randolph, J. at 249.

Were the overbreadth doctrine brought to the court by a proper party, our dissenting colleague, admittedly, makes a strong case for why Congress might have done better than to ban all pirates from applying for a broadcast license. *See* dissenting op. at 259–261. However, because Ruggiero may not avail himself of that doctrine, the only remaining question for the court is whether, under something more than minimal scrutiny, Congress reasonably could have concluded that a blanket prohibition of granting low-power licenses to individuals such as Ruggiero would further the purposes underlying what is, essentially, a regulatory system largely reliant on voluntary compliance. *See In re Creation of Low Power Radio Serv.,* 15 F.C.C.R. 2205, 2226, 2000 WL 85304, *on reconsideration* 15 F.C.C.R. 19,208, 2000 WL 1434686 (2000), *amended by* 16 F.C.C.R. 8026, 2001 WL 310997 (2001); Maj. Op. at 245–246. In other words, the question is whether Congress's method is "substantially related to the Government's interest — a somewhat higher level of inquiry than mere rational relationship." *News America,* 844 F.2d at 821 (Robinson, J., dissenting). The ban, which applies without regard to the content of the pirates' speech, advances a strong governmental interest by precluding pirates, who have intentionally violated the Communications Act, from applying for a license under a regulatory scheme that depends heavily on voluntary compliance. Maj. Op. at 243–245, 245–246. Hence, Ruggiero fails to show that the ban violates the First Amendment or the Equal Protection Clause.

TATEL, Circuit Judge, dissenting:

No one doubts, as this court and the Commission repeatedly emphasize, that broadcasting without a license is a serious offense. Severe penalties, including fines, forfeitures, and even imprisonment, have long existed for unlicensed broadcasting. Moreover, the Commission has ample au-

thority, which it regularly exercises, to deny licenses to former unlicensed broadcasters who, in the Commission's judgment, cannot be trusted to function as truthful and reliable licensees. The question presented here is whether unlicensed microbroadcasters, many of whom have already been punished for their misdeeds, may be subjected to a unique and draconian sanction that automatically and forever bars them—unlike any other violator of the Communications Act or regulations—from applying for low power licenses regardless of either the circumstances of their offenses or evidence that they can nevertheless operate in the public interest. Because this double standard is indefensible, because the statute's automatic lifetime ban restricts speech, and because the court, though purporting to embrace this circuit's more than minimal scrutiny standard, actually subjects the statute to the minimal scrutiny reserved for non-First Amendment cases, I respectfully dissent.

I.

The Radio Broadcasting Preservation Act's character qualification "prohibit[s] any applicant from obtaining a low power FM license if the applicant has engaged in any manner in the unlicensed operation of any station in violation of section 301 of the Communications Act of 1934." Pub.L. No. 106–553, 114 Stat. 2762, § 632(a)(1)(B) (2000) (RBPA). The court glosses over the statute's unusual harshness. No other violations of the Communications Act or broadcasting regulations result in automatic disqualification or are punishable by this broadcasting equivalent of the death penalty. Except in the case of unlicensed microbroadcasters, the Commission "treat[s] violations of the Communications Act, Commission rules or Commission policies as having a *potential* bearing on character qualification." *Policy Regarding Character Qualifications in Broadcast Licensing,* 102 F.C.C.2d 1179, ¶ 56, 1986 WL 292574

(1986) ("1986 Character Policy Statement") (emphasis added), *recon. granted in part and denied in part,* 1 F.C.C.R. 421, 1986 WL 292334 (1986). Even as to FCC-related misconduct involving "misrepresentation," viewed by the Commission as "rais[ing] immediate concerns over the licensee's ability to be truthful in any future dealings with the Commission," no Commission rule subjects full power applicants to automatic, lifetime disqualification. *Id.* ¶ 57. In addition, the Commission allows full power applicants with unclean records to demonstrate rehabilitation. *Id.* ¶ 105. In this regard, the Commission considers "the passage of time since the misconduct, the frequency of misconduct, the involvement of management and the efforts to remedy the situation." *Id.* Moreover, any misconduct, communications-related or otherwise, occurring more than ten years prior to the filing of a full power application is completely disregarded. *Id.*

The RBPA treats unlicensed microbroadcasters quite differently, however. Instead of having past offenses evaluated as just one factor in assessing their qualifications, instead of having an opportunity to demonstrate rehabilitation, and instead of having their sins forgiven after ten years, they are automatically and forever barred from low power frequencies. This capital sanction has been imposed not just on Petitioner Greg Ruggiero, but also on education- and church-related organizations that, in response to the Commission's RBPA implementing regulation, confessed to some prior acts of unlicensed broadcasting: Foundation for California State University, San Bernardino; Hume Lake Christian Camps; Calvary Chapel of Simi Valley, Inc.; Friends of the South County Library; All That Is Catholic Ministries; and Pentecostal Church of the Eternal Rock. *See Creation of a Low Power Radio Serv.,* 16 F.C.C.R. 8026, 8060–61, 2001

WL 310997 (2001) ("Second Low Power Report and Order") (amending *Creation of Low Power Radio Serv.*, 15 F.C.C.R. 2205, 2000 WL 85304 (2000) ("First Low Power Report and Order") (codified at 47 C.F.R. § 73.854)).

Not only is the RBPA's character qualification an unusually harsh broadcasting regulation, but automatic lifetime bans appear rarely in American law. True, the Fourteenth Amendment allows states to ban felons from voting, U.S. CONST. Amend. XIV, § 2; *see Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), and the Commission points to a few statutes that authorize lifetime bans, *see* Respondent's Br. at 20–21, but none involves restrictions on speech.

## II.

The court gets off to a good start: It says it rejects the Commission's position that in reviewing the RBPA's constitutionality, we should apply only minimal scrutiny. Maj. Op. at 245. I have two concerns with what follows, however. First, I think the First Amendment values at stake here are weightier than the court's opinion suggests. Second, in sustaining the RBPA's constitutionality, the court actually applies the same minimal scrutiny standard it purports to reject.

First, the values at stake: Although no one has a First Amendment right to broadcast, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 388–89, 89 S.Ct. 1794, 1805–06, 23 L.Ed.2d 371 (1969), denial of a license unquestionably burdens an applicant's opportunity for future speech. The purpose of the licensing process is to facilitate constitutionally protected speech, albeit speech somewhat less protected than that occurring outside broadcasting. *See FCC v. League of Women Voters*, 468 U.S. 364, 378, 104 S.Ct. 3106, 3116, 82 L.Ed.2d 278 (1984) ("[W]e have ... made clear that broadcasters are engaged in a vital and

independent form of communicative activity.").

As the Supreme Court made clear in *Red Lion*, moreover, the public has a First Amendment right "to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co.*, 395 U.S. at 390, 89 S.Ct. at 1807. The Court further explained:

> [T]he people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment.... It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee.

*Id.* The public's First Amendment right to diverse broadcasting is especially important, for it is the source of the Commission's authority to limit broadcast ownership and to apportion scarce broadcast spectrum to persons of good moral character. *See League of Women Voters*, 468 U.S. at 380, 104 S.Ct. at 3117 ("Thus, although the broadcasting industry plainly operates under restraints not imposed upon other media, the thrust of these restrictions has generally been to secure the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern."); *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 794–95, 98 S.Ct. 2096, 2111–12, 56 L.Ed.2d 697 (1978) ("*NCCB*"); *Red Lion Broad. Co.*, 395 U.S. at 387–90, 89 S.Ct. at 1805–07. Indeed, when the Commission authorized the new low power service in its 2000 Report and Order, it did so expressly to increase broadcasting diversity. "We believe that the LPFM service authorized in this proceeding," the Com-

mission explained, "will provide opportunities for new voices to be heard and will ensure that we fulfill our statutory obligation to authorize facilities in a manner that best serves the public interest." First Low Power Report and Order, 15 F.C.C.R. at 2206, ¶ 1.

Our decision in *News America Publishing, Inc. v. FCC,* 844 F.2d 800 (D.C.Cir. 1988), identifies still another reason for rejecting rational basis analysis. In that case, we confronted a statute that forbade the Commission from extending existing waivers of the cross-ownership rules. The provision affected only two such waivers, both held by a single publisher/broadcaster, Rupert Murdoch. *News America*'s challenge to the provision "l[ay] at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons." *Id.* at 804. Reviewing the case law, we identified a "spectrum" of possible broadcast restrictions, "from the purely content-based (*e.g.,* 'No one shall criticize the President') to the purely structural (*e.g.,* the cross-ownership rules themselves)," and suggested that the applicable level of constitutional scrutiny increases with the extent to which a challenged provision relies on the identity of the speaker or the content of the covered speech. *Id.* at 812. On this spectrum, the challenged prohibition on extending cross-ownership waivers was "far from purely structural . . . as it applie[d] to a closed class of one publisher broadcaster." *Id.* Concerned that "[t]he safeguards of a pluralistic political system are often absent when the legislature zeroes in on a small class of citizens," but wary of intermediate scrutiny, we concluded that "[w]hat suffices for this case is that more is required than 'minimum rationality.'" *Id.* at 813–14. Applying this heightened rational basis standard to the challenged provision, we held that the provision's narrow focus

on extension of *existing* waivers of the newspaper-*television* cross-ownership rules—rather than, for example, extensions of *future* waivers or extensions of waivers of the newspaper-*radio* cross ownership rules—rendered the prohibition unconstitutionally underinclusive. *Id.* at 814–15.

Like the prohibition at issue in *News America,* the RBPA's character qualification raises not just First Amendment concerns (it restricts future lawful speech), but equal protection concerns as well because it applies to a limited class of unlicensed microbroadcasters. *Id.* at 812. Although this class is neither "closed" nor as small as *News America*'s, the class is well-defined—it consists of all unlicensed microbroadcasters and applies only to those frequencies reserved for local voices—and the character qualification focuses on the class "with the precision of a laser beam." *Id.* at 814. Indeed, the RBPA prohibition is far more severe than the rule at issue in *News America:* Unlicensed microbroadcasters may never lawfully operate low power stations anywhere in the country, whereas Rupert Murdoch, consistent with the cross-ownership rules, could lawfully have operated television stations outside any community in which he "own[ed] or control[led] a daily newspaper." *Id.* at 802; *cf. NCCB,* 436 U.S. at 800, 98 S.Ct. at 2114–15.

For all these reasons, the appropriate standard of review is neither *NCCB*'s minimal scrutiny nor *League of Women Voters'* intermediate scrutiny, but rather "more than minimal scrutiny." *News Am. Publ'g, Inc.,* 844 F.2d at 813. Although purporting to agree, this court goes on to apply what is effectively minimal rationality review. It treats the RBPA as presumptively valid and disregards the many ways in which the statute is poorly tailored. *See FCC v. Beach Communica-*

*tions, Inc.*, 508 U.S. 307, 313–16, 113 S.Ct. 2096, 2100–03, 124 L.Ed.2d 211 (1993) (explaining characteristics of rational basis review). It is of course true that this en banc court may overrule *News America,* but not, as it has effectively done, without providing a reasoned explanation for doing so. *See Planned Parenthood of Southeastern Penn. v. Casey,* 505 U.S. 833, 866, 112 S.Ct. 2791, 2814, 120 L.Ed.2d 674 (1992) (opinion of O'Connor, Kennedy, Souter, JJ.) ("The need for principled action to be perceived as such is implicated to some degree whenever this, or any other appellate court, overrules a prior case."). In any event, I know of no decision, either of the Supreme Court or this circuit, that applies rational basis review to a statute limiting important First Amendment rights.

Applying our more than minimal scrutiny standard, I have no doubt that ensuring truthful and reliable low power licensees and deterring future violations of the Communications Act—the reasons Congress enacted the RBPA's character qualification—represent important governmental objectives. But this does not end our analysis. We must determine "how well [the RBPA's] aim corresponds with [its] legitimate public purpose." *News Am. Publ'g, Inc.*, 844 F.2d at 814. If the statute is poorly aimed—either because its automatic, lifetime mechanism operates to exclude "conduct that seems indistinguishable in terms of the law's ostensible purpose" of increasing regulatory compliance, *id.* at 805, or because it covers conduct only remotely related to that purpose— then it limits more speech than necessary and "raise[s] a suspicion" that perhaps Congress's "true" objective was not to increase regulatory compliance, but to penalize microbroadcasters' "message." *Id.*; *see* Petitioner's Br. at 30–32 (arguing that Congress passed the RBPA to punish microbroadcasters' message). One need neither endorse the microbroadcasters' tactics, *see Grid Radio v. FCC,* 278 F.3d 1314

(D.C.Cir.2002) (rejecting an argument that penalizing microbroadcasting piracy violates the First Amendment), nor believe the RBPA discriminates against their "message" in order to conclude that the provision's inaccurate aim—it's both under- and overinclusive—is fatal.

### III.

I begin with the statute's underinclusiveness. *See City of Ladue v. Gilleo,* 512 U.S. 43, 51–52, 114 S.Ct. 2038, 2043–44, 129 L.Ed.2d 36 (1994) (explaining that underinclusiveness in speech regulations may suggest a content or viewpoint discriminatory motive and cast doubt on the government's asserted justification for restricting speech). If banning unlicensed microbroadcasters is vital to ensuring truthfulness and reliability, why does the RBPA exclude so much conduct that seems equally or even more related to those objectives? Specifically, the character qualification bans low power license applications only from unlicensed microbroadcasters, leaving the Commission free to evaluate applications from anyone else under its non-automatic, more permissive general character qualification policy. *See supra* at pp. 253–54. Inveterate regulatory violators, including those full power applicants who broadcast without a license, retain the opportunity to demonstrate that notwithstanding their offenses, they can reliably operate low power stations in the public interest. For example, applicants guilty of fraud or misrepresentation, long considered by the Commission to be among the most serious indicators of unreliability, are not automatically ineligible. *See* 1986 Character Policy Statement, 102 F.C.C.2d 1179, ¶ 57. They may apply for licenses, and the Commission will consider their misdeeds in evaluating their fitness to hold a license, or even disregard their misbehavior altogether if it occurred more than ten years ago. Of course, Congress need

not address a "perceived problem"—here, the possibility of regulatory violations by other wrongdoers—"all at once," but we reject that "facile one-bite at-a-time explanation" for otherwise inexplicable underinclusiveness in "rules affecting important First Amendment values." *News Am. Publ'g, Inc.*, 844 F.2d at 815.

The RBPA's underinclusiveness is quite pronounced, particularly when compared to the Commission's treatment of full power broadcasters. The Commission does not automatically disqualify full power applicants who have engaged in even "the most atrocious infractions." *Weiner Broad. Co.*, 7 F.C.C.R. 832, 834, 1992 WL 689298 (1992). In *Weiner*, the Commission revoked the "incorrigible Weiner['s]" broadcast license as a result of his numerous alleged violations of Commission rules—including broadcasting without a license, evading a court injunction prohibiting his unlicensed broadcasting, and misrepresenting his true intentions in construction permit and license applications filed with the Commission—but only after considering Weiner's evidence of rehabilitation. *Id.* at 833. "Should a 'decent interval' ensue without notable delict," the Commission even offered, "Weiner is not estopped from applying again." *Id.* at 834. Likewise, in *L.D.S. Enterprises, Inc.*, 86 F.C.C.2d 283, 1981 WL 158528 (1981), a case involving "perhaps the most amoral skein of detected villainy in domestic broadcast history," *Weiner Broad. Co.*, 7 F.C.C.R. at 834, the Commission considered an applicant's evidence of rehabilitation even though he had deliberately distorted newscasts to favor certain senatorial candidates, made illegal campaign contributions, bribed public officials, and attempted to eavesdrop on and intimidate Commission witnesses. *L.D.S. Enter., Inc.*, 86 F.C.C.2d at 286. Finally, in *Modesto Broadcast Group*, 7 F.C.C.R. 3404, 1992 WL

689902 (1992), the Commission reviewed a license application filed by a station whose general manager had operated during the day with relatively high, nighttime power, thus risking interference with other stations. Although the Commission ultimately rejected the application, it did so only after considering the willfulness, duration, and timing of the violations—factors that the RBPA prohibits the Commission from considering in cases involving unlicensed microbroadcasters who seek LPFM licenses. *Id.* at 3422–23.

This court offers three unconvincing explanations for the statute's underinclusiveness. First, it says that "other violations of law simply do not reflect as directly upon the offender's qualification to hold an LPFM license." Maj. Op. at 246. Assuming that to be true, why does the RBPA's automatic and permanent ban not extend to unlicensed full power broadcasters, such as the "incorrigible Weiner"? In any event, I think it not at all obvious that unlicensed microbroadcasters who broadcast briefly and years ago and who shut down promptly when told to do so present any greater risk of unreliable behavior than applicants who recently obtained their licenses through fraud or misrepresentation or who perpetrated the "most amoral skein of detected villainy in domestic broadcast history." If anything, the Weiners of the world should be of greater concern. Nor do I think it inherently obvious that former unlicensed microbroadcasters necessarily present a higher risk of frequency interference than do Weiner or the Modesto general manager. Whether caused by unlicensed microbroadcasters or by licensed broadcasters operating on someone else's frequency, frequency interference is frequency interference. Indeed, unauthorized full power broadcasters, whose range and power far exceed that of microbroadcasters, would seem to

present a greater risk of interference. Of course, such observations would be irrelevant were we applying rational basis review, *see Beach Communications*, 508 U.S. at 313–16, 113 S.Ct. at 2100–03, but our more than minimal scrutiny standard requires us to determine whether Congress's means are appropriately tailored to achieve its goals.

The court's second explanation for the RBPA's single-minded focus on unlicensed microbroadcasters is this: "There is a reasonable fit between the character qualification and the Government's substantial interests in deterring unlicensed broadcasting and preventing further violations of the regulations applicable to broadcasters." Maj. Op. at 247. I agree that deterrence is a substantial governmental interest, but why impose a lifetime ban? Even given the many violations that occurred during the movement to end the low power ban, what is it about unlicensed microbroadcasters, alone among applicants who have committed offenses, that requires a broadcasting "mark of Cain" to deter future offenses? *Genesis* 4:15.

The weakness of the deterrence rationale is particularly evident in view of the fact that the Commission's 2000 Report and Order, which the RBPA replaced, made crystal clear that applicants who continue broadcasting without licenses after the 1999 Notice of Proposed Rule Making would be automatically and forever ineligible for any broadcast license. "[T]he illegality of unauthorized broadcasting," the Commission explained, "must now be presumed to be well-known, and any unlicensed broadcast operation occurring more than 10 days after the *Notice* was issued will make the applicant ineligible for low power, full power, or any other kind of license and will be subject to fines, seizure of their equipment, and criminal penalties." First Low Power Report and Order, 15 F.C.C.R. at 2227, ¶ 55. Neither

the court nor the Commission explains why banning all former unlicensed broadcasters would further deter unlicensed broadcasting, and for good reason: If the threat of automatic and lifetime disqualification is insufficient to deter someone from broadcasting, that person is unlikely to experience a sudden change of heart simply because Congress retroactively extended an identical ban to microbroadcasters who operated illegally prior to the NPRM. And even if, as Commission counsel suggested at oral argument, the RBPA's deterrent effect would be greater because the Commission had authority to waive its more limited bar, Tr. of Oral Arg. at 28:8–32:23, Congress could have corrected that defect simply by making the Commission's rule nonwaivable.

The court's final response to the RBPA's underinclusiveness is that "[t]he judgment that one offense is more serious than another, like the judgment that a punishment of a certain severity is warranted for a particular offense, is not for the judiciary to make." Maj. Op. at 247 n.*. In support of this proposition, the court cites two cases holding that juvenile curfews, both of which included numerous exemptions to protect First Amendment rights, were not unconstitutionally underinclusive because they applied only to juveniles sixteen and under, but not to seventeen-year-olds. *Id.* (citing *Hutchins v. District of Columbia*, 188 F.3d 531 (D.C.Cir.1999) (en banc); *Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir.1998)). The records in both cases, however, contained evidence of disproportionate criminal activity by juveniles sixteen and under, thus providing an empirical justification for the curfews' differential treatment of seventeen-year-olds. *See Hutchins*, 188 F.3d at 543 ("[T]he District brought to our attention more data showing that arrests for youths under 17 have been increasing steadily."); *Schleifer*, 159 F.3d at 849–50 ("[T]he City's

evidence documents a serious problem of crime among younger juveniles."). In *Hutchins,* moreover, this court recognized a logical justification for excluding seventeen-year-olds from the curfew—their inclusion increased the curfew's intrusiveness as well as its enforcement burden. *Hutchins,* 188 F.3d at 543. Far from holding that we should ignore underinclusiveness in regulations that affect important First Amendment rights, the two curfew cases stand for the unexceptional proposition that legislation is not underinclusive if its differential treatment has empirical or logical justification. Absent any such justification for the RBPA's differential treatment of microbroadcasters, this court's disregard of the statute's underinclusiveness is more characteristic of the rationality review the court says it rejects than of the heightened scrutiny it purports to apply.

## IV.

The RBPA's character qualification is poorly aimed for a second reason: Although the RBPA certainly eliminates any risk that unlicensed microbroadcasters will become unreliable or untruthful licensees—after all, they can never become licensees—the statute, because of its automaticity, covers circumstances only marginally if at all related to the purpose of increasing regulatory compliance. *See Simon & Schuster v. Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (invalidating statute as overinclusive); *League of Women Voters,* 468 U.S. at 396–99, 104 S.Ct. at 3125–27 (same). For example, the character qualification bans applications from former unlicensed operators who violated the licensing requirement only briefly or long ago; from operators who shut down immediately upon receiving a Commission order to do so; from operators who have since exhibited, in whatever manner, an ability to abide by federal laws and regulations; from operators who (like Ruggiero, *see* Wangaza Decl.) seek only to serve as members of a multimember board, rather than as president or CEO of an applicant station; and, most tellingly, from operators who were unaware of the licensing requirement at the time of their violation. I do not understand how a restriction that ignores such factors can accurately target those former unlicensed microbroadcasters who do pose real risks of future malfeasance.

According to this court, "[a]ny unlicensed broadcasting demonstrates a willful disregard of the most basic rule of federal broadcasting regulation." Maj. Op. at 247. Of course that's not true of operators who were unaware of the licensing requirement and ceased broadcasting immediately upon being told to do so. In any event, why impose a lifetime ban even for willful violators? Statutory and regulatory violations by full power broadcasters are considered as just one element in the licensing process and completely forgiven under certain circumstances. What is it about these little unlicensed microbroadcasters, some of whom are education and church organizations, *see supra* p. 243–44, that leads this court to exclude any possibility of rehabilitation? I see no rational basis for assuming that all unlicensed microbroadcasters, regardless of either who they are or the circumstances of their violations, can never again be trusted to hold low power licenses.

Contrary to the court's opinion, moreover, neither the Commission Order on Reconsideration nor the House Report supports the proposition that *all* unlicensed microbroadcasters should be automatically and forever banned. In fact, the Commission *rejected* a total ban, applying automatic disqualification to only those unlicensed microbroadcasters who refused to stop either after being told to do so or

within ten days of the 1999 NPRM. *See Creation of Low Power Radio Serv.*, 15 F.C.C.R. 19,208, ¶ 96, 2000 WL 1434686 (2000) (Opinion and Order on Reconsideration). And nothing in the House Report's one-sentence discussion of the RBPA's character qualification explains why all former unlicensed microbroadcasters, regardless of the circumstances of their violations or evidence of rehabilitation, must be automatically barred in order to ensure licensee truthfulness and reliability. H.R. Rep. No. 106–567, at 8 (2000).

The RBPA's overinclusiveness is serious. Because the statute covers so much behavior unrelated to regulatory compliance, it limits more speech than necessary to accomplish Congress's objectives. Moreover, contrary to *Red Lion*, by unnecessarily denying licenses to potential speakers, the RBPA may be limiting broadcast diversity and doing so in the very portion of the spectrum set aside for new voices. *See Ashcroft v. ACLU*, 535 U.S. 564, 122 S.Ct. 1700, 1718, 152 L.Ed.2d 771 (2002) (Kennedy, J., concurring) ("Indeed, when Congress purports to abridge the freedom of a new medium, we must be particularly attentive to its distinct attributes, for 'differences in the characteristics of new media justify . . . differences in the First Amendment standards applied to them.'" (quoting *Red Lion Broad. Co.*, 395 U.S. at 386, 89 S.Ct. at 1804–05)).

Though arising in a different context, the Supreme Court's recent decision in *Thomas v. Chicago Park District*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), highlights the RBPA's fatal overinclusiveness. *Thomas* involved a challenge to an ordinance that permitted (but did not require) denial of an application to parade in a public park when an applicant had, among other things, "violated the terms of a prior permit." *Id.* at 324, 122 S.Ct. at 780–81. Holding that the First Amendment does not preclude discretionary license denials, the Supreme Court explained:

> The prophylaxis achieved by insisting upon a rigid, no-waiver application of the ordinance requirements would be far outweighed, we think, by the accompanying senseless prohibition of speech . . . by organizations that fail to meet the technical requirements of the ordinance but for one reason or another pose no risk of the evils that those requirements are designed to avoid.

*Id.* at 325, 122 S.Ct. at 781. The issue in *Thomas* is quite similar to the one we face here, even though the broadcast spectrum, unlike a public park, is not a public forum. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 676, 118 S.Ct. 1633, 1640–41, 140 L.Ed.2d 875 (1998) (holding that public forum doctrine did not apply to public television broadcast). Both cases involve forums unable to accommodate all speakers, and in both cases the government seeks to avoid chaos and to ensure the forums' availability for use by as many speakers as possible. In *Thomas*, the Court discussed the constitutionality of a "rigid, no-waiver" rule that would automatically deny permits to persons who had violated park district rules; here, Congress adopted a "rigid, nowaiver" rule that automatically denies low power licenses to all former unlicensed microbroadcasters. To use *Thomas*'s words, then, the "prophylaxis achieved by" the RBPA's character standard is "far outweighed . . . by the accompanying senseless prohibition of speech" by applicants who once broadcast illegally "but for one reason or another pose no risk of the evils that those requirements are designed to avoid."

The concurring opinion, relying on *Los Angeles Police Department v. United Reporting Pub. Corp.*, 528 U.S. 32, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999), argues that Ruggiero "cannot invoke the [First

Amendment] overbreadth doctrine." Randolph Op. at 249. I disagree for two reasons. First, unlike United Reporting, the respondent in *Los Angeles Police Department*, Ruggiero is not " 'a person to whom [the RBPA] may constitutionally be applied' " who is " 'challeng[ing] that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.' " *L.A. Police Dep't*, 528 U.S. at 38, 120 S.Ct. at 488 (quoting *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 3359–60, 73 L.Ed.2d 1113 (1982)). Ruggiero has never conceded that the RBPA may be applied constitutionally to him, much less to anyone else. Quite to the contrary, he argues that the RBPA cannot constitutionally be applied to *anyone* because the statute *automatically* bars unlicensed microbroadcasters (unlike all other Communications Act violators) from future speech without an opportunity to demonstrate to the Commission that notwithstanding their offenses, they can function as truthful and reliable licensees.

It is true that Ruggiero concedes that "some former pirates may lack the requisite character traits to hold [low power] licenses," Petitioner's Reply Br. at 11, and that he never says that his behavior is "not egregious," Randolph Op. at 250. But that's beside the point. Ruggiero argues not that he has a *right* to serve on the low power station's board of directors, but that this poorly tailored statute automatically bars him from even trying to demonstrate to the Commission—which under its general character policy automatically disqualifies not even the most "atrocious" violators—that he can nevertheless be trusted to function in the public interest. Ruggiero thus has no need to take advantage of the overbreadth doctrine's " 'departure from traditional rules of standing,' " designed "to enable persons who are themselves *unharmed* by the defect in a statute nevertheless 'to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.' " *Bd. of Trustees v. Fox*, 492 U.S. 469, 484, 109 S.Ct. 3028, 3037, 106 L.Ed.2d 388 (1989) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973) (emphasis added)).

Second, even if the RBPA could constitutionally be applied to Ruggiero, I believe he would prevail on an overbreadth challenge. To begin with, and contrary to the concurring opinions, the RBPA does present a classic chilling effect. Because the Commission's RBPA regulations require low power license applicants to disclose *all prior unlicensed broadcasting*, those applicants whose piracy went undetected—a situation the Commission considers to be covered by the RBPA, *see* Second Low Power Report and Order, 16 F.C.C.R. at 8030, ¶ 11—must either (1) admit to a prior act of unlicensed broadcasting, an admission leading not just to permanent ineligibility, but also to possible administrative and/or criminal sanctions, or (2) deny their prior misconduct, risking both prosecution for perjury and "additional enforcement actions," *id.* It is thus not accurate to say that "[i]f [unlicensed broadcasters] file applications in the future no harm will befall them. Their applications will simply be denied." Randolph Op. at 249. Rather than face the Scylla of administrative and criminal prosecution for unlawful broadcasting or the Charybdis of perjury and Commission enforcement actions for failing to disclose such broadcasting, former unlicensed microbroadcasters may find it far safer to forego applying for licenses and simply remain silent. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (allowing overbreadth challenge based on potential cutoff of government funding).

It is true that under the Commission's general character policy, applicants must disclose any unlicensed broadcasting. *See* Randolph Op. at 250. But the question here is whether the *RBPA,* not the Commission's general character policy, has a chilling effect. I am unaware of any decision rejecting an overbreadth challenge because the "preceding regime" not actually at issue may have had an equally chilling effect as the challenged provision. *Id.* And for the same reason the RBPA is unconstitutionally overinclusive, Ruggiero could prevail on an overbreadth challenge. *See Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2571–72, 96 L.Ed.2d 500 (1987) (finding statute banning all First Amendment activities at airport "substantially overbroad" and unconstitutional under overbreadth doctrine).

### V.

Declaring the RBPA unconstitutional would not leave Congress powerless to bar unlicensed microbroadcasters from receiving low power licenses. This circuit's more than minimal scrutiny standard leaves ample room for carefully aimed licensing restrictions. Moreover, the Commission already has authority under its long-existing character qualification policy to deny licenses to unlicensed microbroadcasters who, in the Commission's considered judgment, have demonstrated an inability " 'to deal truthfully with the Commission and to comply with [its] rules and policies.' " First Low Power Report and Order, 15 F.C.C.R. at 2226, ¶ 54 (internal citation omitted). In view of this circuit's heightened rational basis standard, however, the court has no basis for sanctioning an automatic, lifetime ban on future lawful speech that applies, indefensibly, to only a limited class of unlicensed microbroadcasters and to just the portion of the spectrum created for new voices.